On Remand from Supreme Court of Alabama
Appellant, Tommy G. Jones, was convicted of robbery in the first degree, and sentenced to fifty years in the penitentiary. He appealed to this court.
This court by opinion dated November 29, 1983,460 So.2d 1380, determined that the District Attorney's comment during closing argument on appellant's exercise of his Fifth Amendment right against self-incrimination constituted reversible error. On the basis of this determination, we reversed and remanded the case.
The Supreme Court of Alabama granted certiorari to consider whether this court was correct in finding that an improper comment had been made upon appellant's claim of the Fifth Amendment privilege, *Page 1386 
with consequent reversal of his conviction, and remandment. Subsequently, the Supreme Court found that this court erred in its determination, and reversed and remanded the cause to us for further consideration in accordance with its opinion. Jonesv. State, 460 So.2d 1382 (Ala. 1984).
The Supreme Court found that the record was silent as to the prosecution's argument, and that defense counsel's objections were not specific, and did not point out substantially the language deemed objectionable. Because of this the Supreme Court held that this court was without means from which it could ascertain any impropriety in the closing argument.
We, in accordance with the opinion of the Supreme Court, find that appellant's contention that the District Attorney's comment upon his claim of Fifth Amendment privilege was improper, is without merit as the issue was not properly preserved for appellate review. Jones v. State, supra.
The above issue as to whether the comments of the District Attorney during closing argument constituted reversible error was the only issue addressed in this court's original opinion. Appellant raises additional issues in his appeal which we will now discuss.
James "Tex" Johnson owned and operated a concrete business in Huntsville, Alabama. On April 7, 1982, he received a telephone call from a person who wanted him to pour a concrete slab in a "pig parlor" at a location in rural Madison County. The calling party gave him instructions on how to get to the location, and he drove there in his truck. It is apparent from the record that the understanding between the caller and Johnson was that Johnson would visit the site, measure the dimensions of the proposed slab, and determine the concrete requirements. Johnson testified that when he arrived at the rural location, which appeared to be an abandoned farm, he was met by the appellant, Tommy G. Jones. He testified that as he stepped out of his truck the appellant said, "Are you Mr. Johnson?" He said, "Yes, sir", and the appellant said, "Well, I was just cleaning up till you got here, we can measure it up in here." Johnson testified that he got a tape measure and notebook from his truck, and he and the appellant walked into the barn with appellant leading the way. After getting into the barn, a man wearing a Halloween type mask and a shaggy black wig, and carrying a long barreled pistol in his hand, jumped out behind Johnson, and ordered him to lie down. Johnson then observed the appellant was carrying a short barreled or snub-nosed pistol in his hand. Johnson lay on the ground, and the man wearing the mask put a pistol to the back of Johnson's head, and demanded his money. Appellant sat on top of Johnson. Appellant took approximately $6,300 from Johnson's pockets, along with his billfold, and removed three rings from his fingers. The two men bound Johnson with hay rope, blindfolded him, and drove away in his truck. The truck was abandoned nearby.
Over the objections of appellant, Richard Jernigan, Chief Criminal Investigator for the Giles County, Tennessee, Sheriff's Department, testified that on April 21, 1982, he was working in an undercover capacity, and as a result of a conversation with the Sheriff of Giles County, he along with some other officers went to a location just north of Athens, Alabama, and met with Johnny Wallace, who was the owner of the Decatur, Alabama, stockyards. As a result of that meeting, Jernigan, Wallace, and another officer went in Wallace's pick-up truck to a roadside park in the community of Elkton, Tennessee, where they parked and waited. Jernigan testified that the appellant, Tommy G. Jones, appeared, but seemed hesitant, and did not approach them, but walked away. Jernigan further testified that on the next day, April 22, 1982, he was contacted by Joe Scott, an investigator with the Livestock Theft Investigation Unit of the Alabama Department of Agriculture and Industries, and he and Scott drove to a rural farm in Giles County in Wallace's automobile. Scott carried $14,000 in cash with him. Jernigan testified that Scott was to pose as a cattle buyer. When they arrived they discovered *Page 1387 
that the farm was abandoned. They drove into the barn lot. Appellant Jones approached them from the direction of the barn, and, waving, said, "Hello, how are you doing? Glad to see you found it all right." Scott placed his weapon under the car seat, and got out to talk with appellant. Scott and appellant walked to the other side of a hedgerow, and Jernigan heard the appellant say, "Here's the hay I was telling you about." Jernigan heard scuffling beyond the hedgerow, and heard Scott say, "What is this? What's the gun for? Don't shoot me." He observed appellant through the hedgerow holding Scott by the arm, and pointing a pistol at Scott's head. Jernigan then observed another person running toward him in a crouched position from the hedgerow. This person wore a Halloween type mask over his face, and was pointing a "four-inch blue steel revolver" directly at him. Jernigan identified himself, and ordered the man to halt. The man continued to advance on Jernigan, and cocked his pistol, at which time both Jernigan and the masked man opened fire. Two shots were fired by the masked man, one narrowly missing Jernigan, and Jernigan fired four shots, all of which struck the masked man, bringing him down. Jernigan then turned his attention towards the appellant and Scott, identifying himself, and firing two warning shots. Appellant started running toward the barn, and while running raised his pistol, pointing it at Jernigan. Jernigan fired at appellant, wounding him, and appellant fell to the ground. The masked man was identified as Leo Crumley. He died from his wounds.
Immediately after the shooting, Jernigan removed a "wadded up" bundle of rope from appellant's hip pocket, and took from him a short-barreled 3"-inch blue steel .38 caliber revolver. Jernigan took a 4"-inch barrel, .38 caliber blue steel revolver from the masked man. The mask was removed from the masked man, and turned over to the local sheriff's office.
Photographs showing a bloody mask, wig, and two pistols were offered into evidence by the State, and admitted without objection. Johnson positively identified the wig and mask shown in the photographs as being the identical ones worn by the masked man that robbed him in Madison County. He also positively identified the 4"-inch barrel pistol shown in the photographs as the one carried by the masked man during the Madison County robbery, and testified that the short barrel pistol was the same type which the appellant carried. Johnson identified appellant as one of the men that robbed him. He was positive in his identification. He testified that appellant was the one without the mask, and he got a good look at him, "looking him right square in the face".
Jernigan testified that the mask shown in the photographs was the identical mask worn by the masked man, Leo Crumley, during the incident in Tennessee. Jernigan also positively identified the 4"-inch barrel pistol shown in the photographs as the one carried by the masked man during the incident in Tennessee, and the short barrel pistol as the one carried by appellant in Tennessee.
Appellant testified that he did not participate in the robbery of Johnson, and had no knowledge of it. He claimed that Johnson was mistaken in identifying him as a participant in the robbery. He attempted through witnesses to establish an alibi defense. As to the incident in Tennessee, he admitted going to Tennessee with Leo Crumley, but when questioned about details of the incident in Tennessee, he invoked the Fifth Amendment. He admitted knowing Leo Crumley, who had lived near him, and testified he had known him about eight months prior to the incident.
Appellant contends that the trial court erred "in allowing hearsay testimony to be used to prove two crimes were committed in a novel and peculiar manner, therefore, making evidence of the later crime admissible in the trial of the first alleged crime". He specifically refers to that part of the record where, during an examination of Jernigan out of the hearing of the jury, the trial court stated, inter alia, that both incidents involved a telephone invitation for a *Page 1388 
person to meet at some rural location to conduct some sort of business transaction. Appellant also states in his brief that the testimony concerning the negotiations in Tennessee was obviously hearsay. The hearsay testimony involving the invitations to deal and the preliminary negotiations in Tennessee came from Jernigan when he was being questioned on voir dire out of the presence and hearing of the jury. The questions which elicited this testimony were never asked of Jernigan when he was testifying before the jury, and the hearsay evidence complained of was never offered for the jury's consideration. Therefore, appellant's contention in this regard is without merit. Appellant also contends that when the hearsay is excluded there is no evidence that the two transactions were similar. We do not agree.
The appellant further contends that "the trial court committed reversible error in allowing the testimony of Richard Jernigan . . . . who testified exclusively about events that related to an alleged crime in another state some two weeks after the crime the appellant was charged with in the indictment". He further contends that "the prejudicial effect of evidence of the subsequent crime outweighed the probative value of the evidence submitted strictly to bolster a positive identification by the victim".
Appellant objected to the testimony of Jernigan on the grounds that it was evidence of another crime, and therefore inadmissible. After examination of Jernigan on voir dire, the trial court ruled that his testimony was admissible, saying, in part, as follows:
 ". . . . I think that there are novel and peculiar aspects of both these crimes that bring it under the identity exception, and those are: the unusual mask that we have here that's been identified by both the witness in this case and the witness from Tennessee as being the very mask; you've got the same or similar weapons used in both instances, the most unusual weapon being common to both; you've got two men in both instances. Those are the most salient features that come quickly to my mind; but those features indicate a very novel and peculiar manner of conducting the actions in both instances that link them and, therefore, make them admissible in this case because the identity of the defendant is in question here."
As a general rule, in a prosecution for a particular crime, evidence of other acts which of themselves constitute distinct and independent offenses is not admissible. Lewis v. State,399 So.2d 907 (Ala.Crim.App. 1981); Ex parte Williams,350 So.2d 708 (Ala. 1977); Hayes v. State, 384 So.2d 623 (Ala.Crim.App. 1979), cert. quashed, 384 So.2d 627 (Ala. 1980). However, this well established principle of criminal evidence is subject to several equally well established exceptions. Mason v. State,259 Ala. 438, 66 So.2d 557 (1953); Hayes v. State, supra; Lewisv. State, supra. In Lewis v. State, this court quoting fromWharton's Criminal Evidence, Section 31, set out the general categories of exceptions as follows: "(1) Relevancy as part of the res gestae. (2) Relevancy to prove identity of person or of crime. (3) Relevancy to prove scienter, or guilty knowledge. (4) Relevancy to prove intent. (5) Relevancy to show motive. (6) Relevancy to prove system. (7) Relevancy to prove malice. (8) Relevancy to rebut special defenses. (9) Relevancy in various particular crimes." See also C. Gamble, McElroy'sAlabama Evidence, Section 69.01 et seq. (3rd ed. 1977.)
Evidence of other crimes may be introduced in the trial of the present crime, when it is relevant to the present crime and tends to prove an element of the present crime that is at issue. Seymore v. State, 429 So.2d 1188 (Ala.Crim.App. 1983).
Was the trial judge correct in admitting the testimony of Jernigan concerning the incident in Tennessee under the identity exception to the general rule excluding evidence of other offenses?
Williams' Alabama Evidence, § 83 (1967) states: *Page 1389 
 "The rule in Alabama and at common law is that, in a criminal prosecution, proof which shows or tends to show that the accused is guilty of the commission of other crimes and offenses at other times, even though they are of the same nature as the one charged in the indictment, is incompetent and inadmissible for the purpose of showing the commission of the particular crime charged. But such evidence may be admissible for another purpose; the rule is that if evidence tends to aid in identifying the accused as the person who committed the particular crime under investigation, it is admissible, despite the fact that it tends to show that the accused is guilty of other crimes for which he is not on trial."
The distinguishing feature of the identity exception which justifies admission of evidence of other crimes is that the witness's positive identification of an assailant is probative of the perpetrator's identity in the case being tried. Otherwise, the evidence would tend to show only a propensity to commit crimes, or bad character. Such an identification only tends to prove identity if it provides an inference that the person who committed the other crime is also the one who committed the present crime. The manner of commission, or circumstances surrounding the commission, of the two incidents must bear some similarity or "novel and peculiar" features in order to provide the necessary inference. Brumfield v. State,453 So.2d 1097 (Ala.Crim.App. 1984).
Two statements of the general rule as to the identity exception have been frequently relied upon by this court. One is Wigmore's explanation of the source of the inference:
 "For simplicity's sake, the evidential circumstance may thus be spoken of as `a mark.' But in practice it rarely occurs that the evidential mark is a single
circumstance. The evidencing feature is usually a group of circumstances, which as a whole constitute a feature capable of being associated with a single object. Rarely can one circumstance alone be so inherently peculiar to a single object. It is by adding circumstance to circumstance that we obtain a composite feature or mark which as a whole cannot be supposed to be associated with more than a single object.
 "The process of construing an inference of identity thus usually consists in adding together a number of circumstances, each of which by itself might be a feature of many objects, but all of which together make it more probable that they coexist in a single object only." 2 Wigmore, Evidence, § 411 (Chadbourn rev. 1979) (Emphasis in original.)
The other is Judge McElroy's statement:
 "[T]he identity exception to the general exclusionary rule . . . . contemplates the situation where the now-charged crime was committed in a novel and peculiar manner and the state is allowed to show that the accused has committed other similar offenses, in the same novel and peculiar manner, in order to show him the perpetrator of the now charged crime." C. Gamble, McElroy's Alabama Evidence, § 69.01 (8) (3d ed. 1977).
The identity exception may be used only when the defendant's identity has been put in issue. This issue can be injected in several ways. It is not necessary that a special plea be entered, nor that defense witnesses be called, to raise the issue of identity. Identity of the perpetrator is placed in issue when counsel for the defendant cross-examines a witness so as to challenge the witness's identification of the perpetrator. Brumfield v. State, supra; Thomas v. State,409 So.2d 955 (Ala.Crim.App. 1981), cert. denied, 409 So.2d 955
(1982).
As to the relevancy of Jernigan's testimony about the incident in Tennessee to prove identity, the appellant's identity as one of Johnson's robbers was in issue. Although Johnson gave a detailed eye-witness account, and positively identified appellant as one of the men that robbed him, no one else witnessed the robbery except the robber who was masked. Appellant testified that he had no knowledge of the *Page 1390 
robbery, and that the victim was mistaken in identifying him as one of the perpetrators. He testified that he was in Anniston at the time of the robbery, raising the defense of alibi. He presented alibi witnesses who testified in substance that appellant was at some other place at the time of the robbery, the inference of the alibi testimony being that Johnson did not know who robbed him, but that it could not have been appellant. The appellant's counsel extensively cross-examined Johnson as to his opportunity to observe appellant at the time he was robbed. Appellant's identity was very much in issue. The theory of his defense and mistaken identity.
Under the identity exception to the general exclusionary rule prohibiting the admission of other or collateral crimes as substantive evidence of the guilt of the accused, the other crime is not relevant to prove identity unless both that and the now-charged crime are "signature crimes" having the accused's mark and the peculiarly distinctive modus operandi so that they may be said to be the work of the same person. Thomasv. State, supra; Bighames v. State, 440 So.2d 1231
(Ala.Crim.App. 1983); McElroy's, id.
Does the manner of commission of the two incidents or crimes in this case bear such similar or novel and peculiar features as to provide the necessary inference? Are they so similar, novel and peculiar, and do they have such a distinctive modus operandi, that it can be reasonably concluded that they are "signature crimes", and have the appellant's mark on them? Can it be reasonably inferred from the evidence in the record pertaining to the two incidents that they are the work of the same persons? We say yes.
Both incidents occurred in rural areas at abandoned farms with barns; the victims were apparently lured to the farms on some pretense of doing business; two men were involved in each incident; in both cases the man identified as appellant greeted the victims upon arrival; in both cases a man wearing a mask appeared carrying a 4"-inch barrel revolver; in both cases the man identified as appellant was carrying a 3"-inch barrel snub-nosed revolver; Johnson was tied up with rope in the Alabama robbery, and appellant had rope in his hip pocket at the time of the incident in Tennessee; the mask taken from the masked man in Tennessee was identified by Johnson as the identical mask worn by the masked man in the Alabama robbery; the 4"-inch barrel revolver carried by the masked man in Tennessee was identified by Johnson as the identical revolver carried by the masked man in the Alabama robbery; appellant knew Leo Crumley prior to the robbery in Madison County; they lived in the same general area; and the robbery in Alabama and what was obviously an attempted robbery in Tennessee occurred within two weeks of each other and in the same general area. The similarity between the two, novel and peculiar features of the two incidents is striking. The modus operandi used in both is the same and is so peculiarly distinctive that any reasonable person would be compelled to conclude that the crimes were the work of the same persons. We conclude that they are "signature crimes", having the appellant's "mark".
We hold that Richard Jernigan's testimony concerning the incident in Tennessee was properly admitted under the above exception of relevancy to prove identity even though it tended to prove commission of another crime.
We have examined each issue raised in the appellant's brief. In addition, we have searched the record for errors injuriously affecting the substantial rights of appellant, and have found none. The judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur. *Page 1391