STATE of Missouri, Respondent,

v.

Martin SLADEK, Appellant.

No. 74230.

Supreme Court of Missouri,
En Banc.

June 30, 1992.

Arthur S. Margulis, David R. Crosby, Richard J. Eisen, Lawrence G. Gillespie, St. Louis, for appellant.

William L. Webster, Atty. Gen., Barbara J. Wood, Asst. Atty. Gen., Jefferson City, for respondent.

WILLIAM E. TURNAGE, Special Judge.

Martin Sladek was convicted in a jury-waived trial of first degree sexual assault, § 566.040, RSMo 1986,[1] and first degree deviate sexual assault, § 566.070. The court assessed punishment at a term of seven years on each count with the sentences to be served concurrently. On appeal to the Court of Appeals, Eastern District, the conviction was affirmed, and this Court ordered the case transferred. It is now before this Court the same as if on original appeal. Art. V, § 10 Constitution of Missouri. Reversed and remanded.

Sladek is a licensed dentist in the State of Missouri and at the time of the offense was employed by another dentist. The victim was an 18–year–old girl who was employed in the same dental office as an assistant. On February 11, 1989, the victim called Sladek at his home and told him that she thought she had chipped a tooth. They agreed to meet at the dental office for Sladek to examine the tooth.

After the two met at the office the victim assembled a tray of instruments. Sladek then placed the victim under nitrous oxide plus oxygen sedation (relative analgesia). The victim testified that the nitrous oxide was strong and the gauge on the analgesia machine indicated a flow rate of 5 to 6 liters per minute of nitrous oxide and 2 to 3 liters per minute of oxygen. The victim testified that after the administration of nitrous oxide she was unable to move her arms and legs.

She testified that while she was unable to move her arms and legs Sladek forced her to perform an act of sodomy and thereafter raped her. The State produced an expert who testified that a patient under relative analgesia at a flow rate of 3.5 liters per minute of nitrous oxide to 2 liters per minute of oxygen could be unable to raise her arms or legs.

The State presented evidence from four of Sladek's former patients who testified about his behavior toward them. One, L.G., testified she was treated by Sladek in October, 1988, while he was working in another dental office. She testified that while Sladek was working in her mouth with one hand he repeatedly placed his other hand on her breast. She stated when

---

1. All sectional references are to RSMo 1986, unless otherwise indicated.

Sladek left the room, she pulled the tissue draped across her chest tight and crossed her hands over it, "to see if he was going to do this again." When Sladek returned, he worked his hand underneath the tissue and began rubbing her breast with the back of his hand. When she became convinced Sladek was touching her breast intentionally, she pushed him away, and he immediately ended the examination.

Another witness, K.A., testified she was treated by Sladek at his previous place of employment in September, 1988. During his examination of the witness, she testified Sladek repeatedly rested his forearm on her breast.

The third witness, R.C., testified she was treated by Sladek in January, 1989, during which treatment Sladek placed his forearm against her breast. Following his treatment of this witness he brushed powder off of her breast with his hand. A fourth witness, S.B., testified she was treated by Sladek in January, 1989. When the treatment by Sladek proved to be too painful in her mouth, the witness decided to leave. Sladek told her the condition could remain a problem and told her to call him if it did and he would meet her at the office at any time to give treatment "even if it is 3:00 a.m." The next day was Sunday, and Sladek called the witness at home four times and left messages for her to call him at home.

Sladek testified and denied any sexual contact with the victim. He also testified he had not inappropriately touched L.G., K.A., or R.C. With reference to S.B. he testified he normally called patients for follow-up.

■ Sladek first contends the State did not make a submissible case on either of the sexual assault charges. In a court-tried case the sufficiency of the evidence is determined by the same standard as in a jury-tried case and that is whether or not there was sufficient evidence from which the trier of fact could have reasonably found guilt. *State v. Harris,* 774 S.W.2d 487, 491 (Mo.App.1989). In determining whether or not there is evidence sufficient to support a finding of guilt, an appellate court may not weigh the evidence but accepts as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and all contrary evidence and inferences are ignored. *State v. Rousan,* 752 S.W.2d 388, 389[1] (Mo.App. 1988).

The State was required to prove Sladek had "sexual intercourse with another person to whom he is not married and who is incapacitated ...", § 566.040, and he had "deviate sexual intercourse with another person to whom he is not married and who is incapacitated ...", § 566.070.

■ The uncorroborated testimony of the victim in a case of sexual assault is sufficient to sustain a conviction. *State v. Erickson,* 793 S.W.2d 377, 384 (Mo.App. 1990). "Corroboration is not required unless the victim's testimony is so contradictory and in conflict with physical facts, surrounding circumstances and common experience, that its validity is thereby rendered doubtful." *State v. Harris,* 620 S.W.2d 349, 353 (Mo. banc 1981). Conflict between the testimony of the victim and other witnesses does not require application of the corroboration rule. *State v. Daniel,* 767 S.W.2d 592, 593 (Mo.App.1989).

■ Sladek recognizes the above principles but contends the testimony of the victim did not constitute substantial evidence to support a finding of guilt because the court found her to be "not a good witness" and for the further reason that the court relied on evidence of other crimes in its finding. At the time of sentencing the trial court made the following statement:

The victim in this case was not a good witness. The State's witness, the State's expert, was destroyed by cross-examination. Defendant's expert was a much much better witness than the State's witness.

The testimony of [L.G., R.C., K.A.], the other three alleged victims of the misdemeanors, was crucial to the finding of guilty beyond a reasonable doubt.

\*　　\*　　\*　　\*　　\*　　\*

If the court is in err on [sic] permitting those three witnesses to testify, the judgment in this case should be reversed because their testimony was that important to the decision in the case.

Based upon their testimony I have found defendant guilty beyond a reasonable doubt, and I will therefore proceed with sentencing.

From his argument it is apparent Sladek confuses submissibility with the weight of the evidence. Here, the victim testified in detail about the sexual assaults. Her testimony was not such that the corroboration role was triggered and was sufficient to support the submissibility of the case.

■ The serious question in this case involves the propriety of the admission over objection of the evidence of L.G., K.A., and R.C. concerning Sladek's improper touching of them. He contends this was the admission of evidence of uncharged crimes unrelated to the crime for which he was on trial. The State contends that the evidence from the other patients is admissible under the common plan or scheme exception to the general rule that evidence of uncharged crimes is not admissible. The State contends that Sladek had a common plan or scheme to make patients the target of his misdeeds.

The general rule concerning the admission of evidence of uncharged crimes was stated in *State v. Reese*, 274 S.W.2d 304, 307 (Mo. banc 1954):

The well established general rule is that proof of the commission of separate and distinct crimes is not admissible unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial. * * * Evidence of other crimes, when not properly related to the cause on trial, violates defendant's right to be tried for the offense for which he is indicted. *State v. Shilkett*, 356 Mo. 1081, 204 S.W.2d 920, 922–923.

The Court further stated that exceptions to the general rule are as well established as the rule itself and quoted from *People v. Molineux*, 168 N.Y. 264, 61 N.E. 286, 294 (1901), as follows:

Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial.

The Court further stated (quoting from *State v. Lyle*, 125 S.C. 406, 118 S.E. 803, 807 (1923)):

The test of whether evidence of other distinct crimes falls within any of these exceptions has been aptly stated as follows: "The acid test is its logical relevancy to the particular excepted purpose or purposes for which it is sought to be introduced. If it is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidently proves the defendant guilty of another crime."

The Court further stated that evidence of other crimes could have a dangerous and misleading probative force and because of that the Court should require that the admission of evidence of other crimes be subjected to rigid scrutiny. The Court held that the reason for such precaution is that such evidence could "raise a legally spurious presumption of guilt in the minds of the jurors." *Id.* at 307.

■ It will be noted that proof of the commission of separate and distinct crimes is not admissible unless such proof has a legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial. This rule was stated in *State v. Spray*, 174 Mo. 569, 74 S.W. 846 (1903), as follows:

The testimony of a separate offense must have some tendency to prove the charge in the indictment. It is admissible only on the ground that it has some logical connection with the offense proposed to be proven. It is clearly not admissible on the theory that, if a person will commit one offense, he will commit another.

Further in *State v. Buxton*, 324 Mo. 78, 22 S.W.2d 635, 636[1] (1929), the Court held it is not enough to show that a person on trial committed one or more other crimes of the same general nature as the crime for which he is on trial. The Court held: "To be admissible, proof of the commission of another crime or other crimes must have some legitimate tendency to prove that the accused committed the crime for which he is being tried."

In assessing whether or not evidence of uncharged crimes is admissible it is essential that the primary rule of evidence governing the admission of evidence of uncharged crimes be observed—that is, that the proof of such crimes has a legitimate tendency to directly establish the defendant's guilt. The exceptions stated in *Reese*, though not necessarily all inclusive, simply state some material facts that evidence of uncharged crimes may prove. Thus, evidence of the commission of an uncharged crime may prove motive or intent or another material fact, but in any event the evidence must have some legitimate tendency to directly establish the defendant's guilt.

The inquiry in this case is thus focused on whether or not the evidence from the other patients of Sladek has some legitimate tendency to directly establish his guilt of the charge of rape. An examination of the evidence does not reveal any tendency of such evidence to prove Sladek's guilt of rape. The fact that he may have touched the breasts of three former patients would have no tendency to prove that he gave the victim in this case nitrous oxide in sufficient quantity to disable her and thereafter rape her. The most that can be said for such evidence is that it shows that Sladek may have committed a crime on each of these patients; but as held in *Spray*, evidence is not admissible on the theory that if a person will commit one offense he will commit another. In short, the evidence from the other patients would prove at most that Sladek had a propensity to be attracted sexually to female patients. However, evidence of propensity in this case does not suffice to supply the requisite nexus between the other crimes and the crime for which Sladek was on trial.

*Reese* further held that "if the court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected." *Id.* at 307. Here, there is no clear perception of the connection between Sladek's actions toward the other patients and the charge of rape for which he was being tried.

The State contends that Sladek had a common scheme or plan to exercise his authority over female patients in order to take advantage of them sexually. Even if it be conceded that such a common scheme or plan was shown, there remains the problem that there is no logical relevance in the acts toward the other patients to prove the commission of the rape.

The court of appeals affirmed Sladek's conviction by relying on *State v. Dee*, 752 S.W.2d 942 (Mo.App.1988). In that case a caseworker with the division of family services was charged with forcible rape of a mother whose child was the object of DFS concern. The State introduced evidence by another mother with whom Dee had worked that Dee had told her that if she would cooperate that things would go her way, and if she did not, things would not go her way. He thereafter attempted to hug and kiss her. The court held that this evidence was not preserved for appellate review. The only evidence that the court reviewed consisted of the testimony of another mother with whom Dee worked that Dee had asked her out for a drink, which she declined, and had told her that he could take a woman like her and she would melt like butter in his hand. The court held that the evidence showed that Dee had a common scheme or plan to use his position as a caseworker to obtain sexual gratification. The court lumped the conduct of Dee with the two mothers together and held that such evidence was admissible.

The facts in this case are distinguishable from the facts in *Dee*. In this case there is no showing that Sladek had any authority

or power over his patients as a person in the position of Dee would have over mothers whose children were under DFS supervision. Dee was in a position to make recommendations concerning the custody of the children, which could have a devastating effect on the mother. In this case, the patients of Sladek were there voluntarily, and the four former patients who testified were free to leave at any time they thought Sladek was doing anything improper. In fact, one of the patients did leave and refused to go back to see Sladek. Thus, *Dee* and this case are not comparable.

The evidence from the other patients of Sladek fails to meet the test that such evidence have a legitimate tendency to directly establish the guilt of Sladek. For that reason the evidence of the four former patients was not admissible and the court erred in receiving such evidence.

■ The question next arises of whether or not the admission of such improper evidence in a court-tried case calls for a reversal of the judgment. In *State v. Leigh*, 580 S.W.2d 536, 545[13] (Mo.App.1979), rev'd on other grounds *Leigh v. State*, 639 S.W.2d 406 (Mo.App.1982), the court stated:

> In a jury-waived case a certain amount of latitude in the admission of evidence is allowed, and even where an error is made in the admission of some evidence, except where the trial court relied on that evidence in arriving at its findings of fact and conclusions of law, such error is ordinarily held to be non-prejudicial. This is so because the rules of exclusion in the law of evidence as applied in a court of law are largely as a result of the jury system and serve the purpose of keeping from the jury all irrelevant and collateral matters which might tend to confuse them or mislead them from a

consideration of the real question in issue; when an action is to the court sitting without a jury, the rules of exclusion are less strictly enforced.

Here, it is obvious that the court relied on the improper evidence in reaching its decision. For that reason the admission of the improper evidence was prejudicial, and the judgment must be reversed.

■ The next question is whether or not this cause may be remanded for retrial. In *State v. Wood*, 596 S.W.2d 394, 398[1, 2] (Mo. banc 1980), this Court held that a retrial is constitutionally permissible if a conviction is reversed solely due to trial error. The State introduced sufficient evidence to make a submissible case but inadmissible evidence influenced the fact finder to reach a finding of guilt. A new trial is permissible because a reversal is necessitated by the trial error in admitting evidence of uncharged crimes.

The judgment is reversed and this cause is remanded for a new trial.

ROBERTSON, C.J., COVINGTON, HOLSTEIN and BENTON, JJ., and FENNER, Special Judge, concur.

THOMAS, J., concurs in separate opinion filed.

PRICE, J., not sitting because not a member of the Court when case was submitted.

THOMAS, Judge, concurring.

I concur in the decision of the Court to reverse the judgment of the trial court and to remand for a new trial. I write separately because courts have struggled with the application of the evidence rule concerning the admissibility of prior crimes,[1] and particularly, admitting such evidence

---

1. This opinion uses the term "prior crimes" to refer to the type of evidence to be considered under the issue discussed herein. Although the uncharged crime usually occurs prior to the crime being tried, this is not a requirement and the same type issues can arise concerning the admissibility of a subsequent crime. In addition, although the term "crime" is used, neither a prior conviction nor a charge is required; the principles clearly cover any wrongdoing that could have been the subject of a criminal charge and probably covers other wrongful acts and conduct to the extent that it conveys to the jury the type of prejudice that accompanies a disclosure that the defendant has engaged in criminal conduct. Professor Edward J. Imwinkelried, University of California at Davis, has published a book entitled *Uncharged Misconduct Evidence*, covering this area; his title more accurately described the type of evidence at issue.

under the exception commonly referred to as common scheme or plan. I am hopeful that some discussion of the theories involved and the labels used in discussing these principles will be helpful.

The well-established general rule provides that specific instances of conduct relating to other crimes, wrongs or acts are inadmissible to prove character as the basis for an inference that an accused acted in conformity therewith and committed the crime charged in the present case. *State v. Reese*, 274 S.W.2d 304, 307 (Mo. banc 1954). This general rule can be described as excluding "bad guy evidence," i.e., the defendant's guilt cannot be proved by showing that he committed other crimes and, therefore, is the kind of person who probably committed the crime charged. The statement of the general rule is usually followed by a series of exceptions, i.e., prior crimes, wrongs or acts that are admissible for other purposes such as proof of motive, intent, preparation, common scheme or plan, knowledge, identity or absence of mistake or accident. *Mo. Evidence Restated*, § 404(b) (Mo.Bar 1984). The difficult questions inevitably involve defining the exceptions and deciding when they apply.

Both the general rule and the exceptions involve the consistent application of a general rule of relevancy. The definitions of two terms will be helpful. Evidence is "logically relevant" if such evidence tends to make the existence of any material fact more or less probable than it would be without the evidence. This is a very low-level test that is easily met. Crime statistics readily demonstrate that commission of a prior crime by a defendant is logically relevant to the issue of whether the defendant committed the crime charged simply because recidivous statistics demonstrate that prior offenders commit more crimes than persons who have not previously committed a crime.

Evidence that is logically relevant, however, is not necessarily admissible; to be admitted it must also be "legally relevant." Legal relevance involves a process through which the probative value of the evidence (its usefulness) is weighed against the dangers of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time or needless presentation of cumulative evidence (the cost of the evidence). *Mo. Evidence Restated*, § 404(b) (Mo.Bar 1984). If the usefulness of the evidence outweighs its cost, it is legally relevant and is admissible; if the cost of the evidence outweighs its usefulness, then it is not legally relevant and is excluded.

The trial judge has a great deal of discretion in this weighing process. However, in a few areas, the courts have weighed certain evidence so frequently that rules have been established regarding which way the scales tip. Both the general rule of exclusion for evidence of prior crimes and the exceptions to that rule come within the category of relevancy rules that courts have faced on enough occasions that the results are preordained.

Under the general rule of exclusion, the rationale is that although the fact that the defendant committed another crime on a prior occasion has some probative value, this probative value is outweighed by the unfair prejudice that would be injected by informing the jury of the prior crime. The most common dangers are that the jury will penalize the defendant for the prior crime even though he may or may not be guilty of the present crime or that the jury will give more weight to the prior crime than it is actually worth. There is a tendency to assume that because the defendant committed the prior crime, he probably committed the present crime, i.e., the "bad-guy evidence" will be overused. To some extent, the two dangers are related and may overlap. *See* Imwinkelried, *Uncharged Misconduct Evidence*, § 1:03 (1990).

The exceptions to the general rule under which evidence of prior crimes may be admitted also involve the application of the general rule of relevancy. Increased probative value of the prior crime evidence may be found by evaluating its probative value on some other issue in the case (something other than the defendant's propensity to commit a crime). If the increased probative value of the evidence is

sufficient to outweigh the danger of unfair prejudice (the cost), then the evidence becomes admissible; this would then constitute one of the exceptions to the general rule. In other instances, several prior crimes may be combined so as to increase their probative value which results in the prior crime evidence likewise being legally relevant. Although it is seldom discussed by the courts, this reasoning consistently underlies the application of both the general rule and the exceptions.

Much of the confusion of the courts in applying the exceptions arises because of the titles used to identify them. Almost without exception, these titles, which are often one word or a short phrase, inadequately convey the specific limitation and restriction that must be present for the exception to apply. The titles sound generic, but if they are applied broadly and generically without consideration for the underlying theory and reasoning, they will often be improperly applied. This application can easily cause an exception to become so broad that it swallows up the underlying rule of exclusion. The exception for common scheme or plan is particularly susceptible to this problem.

In the present case, the defendant argues that the common scheme or plan exception is only applicable when there is a single plan in which the defendant contemplated the commission of both the prior crime and the crime charged before either crime was committed. *State v. Kenley*, 693 S.W.2d 79 (Mo. banc 1985), is a single-plan case where the defendant went on a crime spree. The state's evidence showed that on January 1 defendant brought a large number of handguns to his home; on the next day, he purchased ammunition, and he and a friend practiced shooting with a silver, .38 caliber pistol. On the following day, he went to a package liquor store, threatened to kill the salesman, robbed him of the cash register money and kidnapped a female customer. After leaving the liquor store with the female customer in his car, he forced her to perform sexual acts. About one-half hour later, he entered a tavern and announced a holdup, telling the people present to "hit the floor," and when they were slow to move, shot and killed one of the men. (He was being tried on a murder charge for this killing.) When he left the tavern, he took the bartender and another woman with him; when his vehicle stalled, he forced the woman to take her automobile and also fired a shot at a bystander as he was leaving. This woman escaped by jumping out of the car door. One-half hour later, he entered a motel and robbed the proprietor at gunpoint and threatened her husband stating, "I'll kill you. I've killed already tonight and I'll kill you." Still later this same morning, he entered a Food Mart in an adjoining state and, after firing a shot into the ceiling, demanded a car and driver and took the car of one of the customers. He was arrested as he left the parking lot.

This Court approved the admission of evidence of all of the crimes stating that defendant's conduct "evidences a common scheme or plan pointing to defendant as the participant in the robbery that resulted in Felts' death." The Court also pointed out that during the later crimes when he stated, "I've already killed tonight," his statements were admissions of the murder charged. The admission of other crimes in this type of case is sometimes called "part of the same transaction (the charged crime)."

Single-plan cases often involve crimes not so close to each other in time but, nevertheless, planned or contemplated from the beginning. The prior crimes in the present case, the defendant's sexual abuse of his former patients L.G., K.A. and R.C., do not qualify for admission under a single-plan theory because the defendant did not contemplate the rape of the victim prior to the time he committed the prior crimes. We need not determine if the common scheme or plan exception is limited to a single plan as long as we evaluate the prior crimes under the other possible exceptions that are sometimes included within the generic title of common scheme or plan. The exception for identity is the most obvious to be considered under this description.

In *Jones v. State*, 460 So.2d 1384 (Ala.Cr. App.1984), the defendant was charged with

the crime that occurred when the victim responded to a telephone call by going out to a certain Alabama farm to do some construction work. When he arrived, he was met by a man he identified as the defendant who took him into a barn where another man wearing a Halloween-type mask and a black wig and carrying a long-barreled pistol robbed him. The defendant participated in the robbery using a snub-nosed pistol. The court admitted testimony by a criminal investigator from Tennessee who testified that two weeks later, he went to a farm with another investigator posing as a cattle buyer, was met by the defendant, taken into a barn where he was held up by a man wearing a Halloween mask and wig identical to the those worn by the masked man in the charged crime. Also, the masked man in the uncharged crime was using the same or an identical gun to that used by the defendant in the charged crime. The defendant denied his involvement in the charged crime and offered an alibi defense. In approving the admission of the evidence of the uncharged crime, the court discussed the identity exception as follows:

> Under the identity exception to the general exclusionary rule prohibiting the admission of other or collateral crimes as substantive evidence of the guilt of the accused, the other crime is not relevant to prove identity unless both that and the now-charged crime are "signature crimes" having the accused's mark and the peculiarly distinctive modus operandi so that they may be said to be the work of the same person.

*Jones,* 460 So.2d at 1390. The court pointed out the similarities in the two crimes and concluded:

> The similarity between the two, novel and peculiar features of the two incidents is striking. The modus operandi used in both is the same and is so peculiarly distinctive that any reasonable person would be compelled to conclude that the crimes were the work of the same persons. We conclude that they are

"signature crimes", having the appellant's "mark".

*Id.*

The identification exception requires a unique and highly similar modus operandi for the series of crimes. The strength of the inference that identifies the defendant depends upon two things: first, the extent to which the defendant's crimes are distinctive from crimes committed by others; and second, the extent to which the defendant's prior crimes and the crime charged are similar. It would not be good enough to simply show that this defendant, now charged with robbery, committed a robbery last month and also one the month before; or that a defendant charged with forging a check had a history of forging checks. Courts often say that modus operandi must be sufficiently unique and sufficiently associated with the defendant that it becomes like his signature. In *State v. Koster,* 684 S.W.2d 488 (Mo.App.1984), the court used the signature analogy by quoting from McCormick on Evidence, § 190, pp. 449–50 (2d ed.1972), as follows:

> [S]uch evidence [prior crime evidence] was properly admitted:
>
> "(T)o prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. Here much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature."

*Koster,* 684 S.W.2d at 491.

One source of confusion is the fact that this category is often called "common scheme or plan," which courts have sometimes used to admit a series of similar crimes but which do not constitute signature crimes. In search of a more descriptive label, this category might be called "signature modus operandi/identity."

A closely related, but different, exception could be called "signature modus operandi/corroboration." Consider, for example, *State v. Dee,* 752 S.W.2d 942 (Mo.App. 1988), discussed in the majority opinion. In *Dee,* the defendant, a caseworker with the

Division of Family Services (DFS), was charged with the forcible rape of a mother who was under the defendant's supervision with respect to her continuing custody of her child. The state alleged that defendant threatened to remove her children from her custody unless she submitted to defendant's sexual advances and, pursuant to this threat, he raped her. *Id.* at 946. The state offered evidence of two other clients who had been threatened in a similar manner. In one case, the defendant questioned her about her sex life, told her she was a nice-looking woman, informed her that if she would cooperate things would go her way, and if she did not, things would not go her way. He then asked her out for a drink, but she declined and rebuffed his attempts to hug and kiss her. *Id.* at 947. The other client testified that the defendant asked her out for a drink, which she declined, and on one occasion told her that "he would take a woman like her and she would melt like butter in his hand, and stuff like that." *Id.* The Court of Appeals, Eastern District, admitted this evidence under the common scheme or plan exception. *Id.* at 947–48.

The defendant's use of his position as a caseworker at DFS to solicit sexual favors from his clients is a unique and special modus operandi, which probably qualifies as a signature modus operandi. This evidence would not be admissible under the signature modus operandi/identity exception because the defendant's identity was not at issue; he admitted he was the caseworker and that the victim was his client but denied that the threat or rape occurred. On the other hand, the increased probative value that arises from the signature modus operandi to overcome the unfair prejudice in an identity case is probably equally strong in a case where it is offered to corroborate a victim's complaint. In an identity case, the probative value of the signature modus operandi in establishing that the defendant committed the crime outweighs any prejudice that might arise by showing the prior crime. The same probative value and the same prejudice is involved in a signature modus operandi/corroboration case such as *Dee.* Thus,

the relevancy scales tip toward admissibility in both types of signature modus operandi cases and they, therefore, constitute proper exceptions under which evidence of prior crimes should be admitted.

The danger in formally recognizing a signature modus operandi/corroboration exception is in the likelihood that the requirement for similarity of the modus operandi will be relaxed to the point where the exception does away with the rule. This particular exception runs a greater risk of such an abuse than the other exceptions because the issue upon which the evidence is being admitted is the same in both the exception and the general rule. Although we have called this exception corroboration, it really involves reasoning from the signature modus operandi based upon the propensity of the defendant to commit this type of crime to the conclusion that the defendant committed the crime charged. This reasoning goes squarely against the rationale for the general rule. This makes it particularly important that the requirement for a signature modus operandi be strictly enforced.

The modus operandi of the crime should be unusual and detailed; not just a run-of-the-mill crime, such as forgery, robbery or burglary. It should be a particular crime carried out in an unusual and special way that has distinguishing characteristics that make it unique to a certain person. A series of prior crimes that meets the requirements of similarity is obviously stronger for admissibility than a single prior crime. A prior crime nearer in time to the charged crime strengthens its relevance. All of these are factors that the court must consider in deciding whether the increased probative value of the signature modus operandi outweighs the prejudice or other cost of the evidence. It is important that this exception not become a slippery slope by which the general rule of exclusion gradually disappears case by case.

The prior crimes in the present case are not admissible under an exception for signature modus operandi/corroboration because the prior crimes are not sufficiently

similar to meet the requirements for this exception. The fact that all four crimes were sexual crimes that occurred in a dental office is not sufficient. If the prior crimes had involved the use of nitrous oxide or some other sedative to disable the patient before the defendant raped her, then they would likely qualify for admission under the signature modus operandi/corroboration exception.

The prior crimes in which the defendant in the present case improperly touched the breasts of his dental patients, L.G., K.A. and R.C., were not admissible under the common scheme or plan because they were not part of a single plan, and they were not admissible under either signature modus operandi exception because they were not sufficiently similar to the crime charged to qualify as signature crimes. I would reverse the trial court on its admission of evidence of these prior crimes and remand the case for a new trial in accordance with the Court's opinion.