**STATE of Missouri, Respondent,**

v.

**Cornelius JOHNSON, Appellant.**

**WD 36591.**

Missouri Court of Appeals,
Western District.

June 24, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 24, 1986.

Application to Transfer Denied
Sept. 16, 1986.

Holly G. Simons, Columbia, for appellant.

William L. Webster, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before NUGENT, P.J., and SHANGLER and MANFORD, JJ.

SHANGLER, Judge.

The defendant Johnson was convicted of two counts of capital murder and was sentenced to concurrent terms of life imprisonment without probation or parole for fifty years. Sections 559.005, 559.011, RSMo Cum.Supp.1975. The appeal presents six contentions of trial error, but does not question the sufficiency of the evidence for conviction of the offenses.

On August 18, 1976, one Bobbie Jean Moore occupied living quarters with Donald Dumas and Loretta Minor. Dumas was a drug dealer and fence and Bobbie Jean had worked as his prostitute. That morning, Bobbie Jean was awakened by voices in the bedroom. She saw the defendant Johnson [whom she knew] in the doorway, a gun trained on Dumas and Minor, back the two into the bedroom. Bobbie Jean arose from the bed, and stood behind Dumas. The intruder demanded to know where Dumas kept the money, and then shot Dumas. As he fell, Dumas pointed to the dresser. Johnson seized the money [proceeds from drug sales, arranged in stacks], and ordered the women into the dining room. Johnson then asked where the drugs were kept, was directed to the coffee table in another room, wrapped the drugs in foil, and then let a second man into the apartment. The two women were forced into the living room, their hands were bound behind the back with tape, and their feet were also bound. They were ordered to lie on the floor. A pillow was placed over the head of Loretta, and a single shot was fired. A pillow was then placed over the head of Bobbie Jean, and a shot fired. Bobbie Jean was able to avert the bullet by a movement of the head. The second intruder noticed that Bobbie Jean survived, and so instructed Johnson to fire again. The second shot struck the left side of her head.

Bobbie Jean lay on the floor until the two intruders left, extricated her feet from the tape, and attempted to telephone for help, but was not successful. Her attempts to rouse other dwellers in the apartment building were no more successful, and she finally ran out of the building clad only in a pajama top, hands still bound behind the back, and was admitted to a residence. She telephoned the police and reported the incidents. The medical examiner gave evidence that Dumas died of a gunshot wound to the head, as did Loretta Minor. Bobbie Jean Moore suffered a superficial bullet wound to the head.

The defendant Johnson presented the alibi testimony of one Vivian Alexander that on the day and time of the shootings, Johnson accompanied her to apply for work at Church's Fried Chicken on Quindaro in Kansas City, Kansas. The defense presented also the alibi testimony of wit-

ness Lawrence McClooney, a former employer of the defendant, that on August 18, 1976 at about 11:30 a.m.—date and hour of the homicides—Johnson had come by to pick up some money owed for work performed there. Johnson told McClooney then that he had "dropped a young lady off who was filling out an application at Church's Chicken." The jury rejected the alibi and found Johnson guilty of two murders.

### The Refusal to Require Prosecution Witness Bobbie Jean Moore to Submit to Psychiatric Examination

In the course of the lengthy proceedings immediately prior to the juration of the venire, the trial court took up a number of formal defense motions. The defendant Johnson requested, and was allowed, to make a record. He moved orally for a continuance on the ground that several witnesses Johnson deemed important to the defense were not summoned by counsel to give testimony at the trial. Johnson suggested to the court also that among other neglects of counsel: "[T]here should be motions to suppress evidence of certain State witnesses. One in particular, the lady by the name of Bobbie Moore, based upon the fact I feel that she's incompetent to testify against me." The reasons Johnson ascribed were:

> "[S]he's been inconsistent in her own, you know, summation of what went down, and everything, I guess, she says in her testimony is contradictory to the physical evidence.
>
> . . . .
>
> "I mean, I feel that something's wrong with her, because I know I'm not guilty of these charges. I've maintained that throughout. But she's saying that she's —she's sworn to God that I did it several times, and I just know something's

wrong, that she's lying or she's mentally deranged or something.

> . . . .
>
> "Well, she sustained, you know, a gunshot wound to the head about 10 minutes after she awakened from, I suppose, a drugged state, because she had—I think she stated at one time or another that she'd been drinking and doing certain narcotics the night before this incident took place.
>
> . . . .
>
> "And I feel, you know, that there's the possibility that something, you know, occurred or just snapped in her brain. I don't know how she, you know, could point me out as being the man." [1]

The trial court responded to Johnson that those were matters that affect the credibility of a witness, matters which—if elicited from the evidence—the jury would evaluate for purposes of belief. In fact, it was elicited from witness Bobbie Jean Moore, by the prosecutor on direct-examination, and then by the defense counsel on cross-examination, that during that period of her life she was a habitual user of cocaine, and the night and early morning before the homicide incidents, she absorbed "a lot of cocaine." That night and morning, Bobbie Jean, Loretta, Dumas and the entire assemblage, were "just getting high." The effect was to "keep you moving," but—in response to cross-examination—did not distort the sense of time. She testified to a vision, some days before the homicides, which presaged the event:

> "Yes, I was laying in the bed, and I was just looking up in the ceiling, and the ceiling opened up and I saw a man break into the apartment with a shotgun and shoot us. But the Lord let it happen differently."

There was no other episode of manifestation.[2]

---

**1.** It should be noted that our review is of the *retrial* of the case, thus the defendant Johnson well knew the testimony rendered on the first proceeding in 1978—the witness of Bobbie Jean Moore, included.

**2.** The vision episode described by witness Bobbie Jean Moore under cross-examination was an incident of the *retrial*. Johnson did not assert that event as another demonstrable aberration to justify an inquiry into her competency as a witness. We assume that it was testimony not

On this appeal, counsel for the defendant ascribes as error that the trial court refused the oral request by Johnson to suppress the testimony of Bobbie Jean Moore, summoned as a witness for the prosecution. Bobbie Jean gave testimony against Johnson at the first trial of the offenses, and it was her disclosures on the stand that, at the time of the shootings she saw and described, she was a habitual user of drugs, and it was her contradictory responses [as Johnson perceived them], and her testimony [mistaken, according to Johnson] that he was the culprit, which demonstrated her incompetency as a witness. The defendant Johnson asserted to the court—"I don't know if the law allows for this, but I think she should be examined by a psychiatrist, or at least Mr. White [counsel] should have investigated that possibility of their being something, you know, wrong with her mentally."[3] We assume for purpose of decision that the motion *pro se*, although by a defendant represented by counsel, was duly before the court, and hence amenable to our review. *State v. Turner*, 623 S.W.2d 4, 12[20] (Mo. banc 1981) *cert. denied Turner v. Missouri*, 456 U.S. 931, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982); *State v. Williams*, 681 S.W.2d 948, 951[8] (Mo.App.1984).

The argument of the defendant tacitly acknowledges that our procedures do not provide for the involuntary psychiatric examination of a prosecution witness in a criminal case. And in fact, Rule 25.03, the formal promulgation for disclosure and discovery in criminal cases, contains no express provision for such a procedure, and our pre-discovery practice rejected any claim by a defendant to the involuntary psychiatric or physical examination of a prosecution witness—asserted as a matter of right. *State v. Cox*, 352 S.W.2d 665, 672[18–20] (Mo.1961); *State v. Oswald*, 306 S.W.2d 559, 563[7–9] (Mo.1957); *State v. Wilson*, 361 Mo. 78, 233 S.W.2d 686, 688[9] (1950). The defendant asserts the power of the court to submit a witness in a criminal case to such evaluation, not as of right—as under a rule or statute [4]—but as an exercise of an inherent discretion when the competency of the witness is questionable. Our decisions have not ruled the question. The defendant argues the effect of cases from other jurisdictions: *Ballard v. Superior Court of San Diego County*, 64 Cal.2d 159, 49 Cal.Rptr. 302, 410 P.2d 838 (bank 1966); *Dinkins v. State*, 244 So.2d 148 (Fla.App.1971); *Easterday v. State*, 254 Ind. 13, 256 N.E.2d 901 (1970); *State v. Gregg*, 266 Kan. 481, 602 P.2d 85 (1979); and *State v. Buckley*, 325 N.W.2d 169 (N.D.1982). Those cases, all criminal prosecutions, were charges of sex offenses. Those courts determined the want of express rule or statute notwithstanding, that in the trial of a *sex offense*, the court possesses the discretionary power to submit the prosecutrix to a psychiatric examination—but only where the defendant demonstrates a compelling necessity for such a procedure. *Ballard*, 49 Cal.Rptr. at 313, 410 P.2d at 849[19]; *Easterday*, 256 N.E.2d at 905–906; *Dinkins*, 244 So.2d at 150[2]; *Gregg*, 602 P.2d at 91[2]; *Buckley* 325 N.W.2d at 171[1]. That guarded grant of discretion to the judge in a sex offense case—as the rationale goes—is to enable the accused to probe whether the complainant was induced to the belief of an assault by an emotional or mental aberration, rather than by the misconduct of the person charged. It subserves the testimonial purpose of impeachment, and hence, credibility. *Ballard*, 49 Cal.Rptr. at 311, 312, 410

given at the first trial. In any event, it was not asserted to the trial court as a basis for relief.

3. The defendant Johnson was at odds with trial counsel as to several facets of the management of the defense and the conduct of the trial. Counsel refused to move formally to examine Bobbie Jean Moore, summoned by the prosecution as a witness, for competency—and hence, the trial court entertained the matter as a *pro se*

initiative, heard and considered the grounds, and refused the request. The court ruled, in effect, that the matters raised *pro se* went to the credibility of the witness, and not to her competency.

4. Rule 60.01(a) allows a court in a *civil case* to order a party and those others specified to submit to a mental examination by a physician where that condition is in controversy.

P.2d at 847, 848[17, 18];[5] *Gregg*, 602 P.2d at 89–92.

The prosecutions against the defendant Johnson, however, were not for sex offenses,[6] nor was the *pro se* motion for the psychiatric examination of witness Bobbie Jean Moore asserted to dispute credibility, but to dispute competency. *Easterday* confirms the discretion of a trial court in a sex offense case—even in the absence of a rule or statute—to submit the prosecutrix to a psychiatric examination, not only to test her credibility, but to test her competency. *Commonwealth v. Gibbons*, 378 Mass. 766, 393 N.E.2d 400 (1979) confirms the discretion of a trial court—but under a statute—to submit a witness in *any* criminal case to a psychiatric examination to test either credibility *or* competency. Whether that endowment of discretion to examine a witness for competency to testi-

**5.** The authority of the *Ballard* rationale that a trial court is vested with the power to order, at discretion, the psychiatric examination of the prosecution witness to test *credibility* was nullified by the 1984 amendment to § 1112 of the California Penal Code. That enactment provides:

> [T]he trial court shall not order any prosecuting witness, complaining witness, or any other witness, or victim of any sexual assault prosecution to submit to a psychiatric or psychological examination for the purpose of assessing his or her *credibility*. [emphasis added]

*See People v. Hagerman*, 164 Cal.App.3d 967, 213 Cal.Rptr. 286, 289 (1985).

**6.** In a case of first impression, the eastern district of the court of appeals has recently determined [*State v. Clark*, 711 S.W.2d 885, 1986] that a trial court in a criminal case is without authority to order the psychiatric examination of the prosecution in a rape case. The defendant—from what appears in the text of opinion—sought the examination as a matter of fair trial and constitutional right, and as a means of impeachment for compelling necessity shown. The victim was a thirteen-year-old child. The court sustained the refusal of the motion by the trial court on the ground that "no Missouri statute or rule authoriz[es] a trial court to order a psychiatric examination of a prosecution witness ... thus [the motion] exceeded the scope of permissible discovery ... No general right of discovery exists for criminal cases in Missouri. Absent some express statutory provision or rule of court, discovery is not permitted." The opinion is rendered without discussion of the rationale which accords a court, in necessitous cases,

fy comes as a rule, statute or decision, that judicial power may be exercised only on "'compelling need'" for such an involuntary procedure [*id.* 393 N.E.2d at 405], a need not proven by a mere assertion of testimonial contradictions, emotional instability, mental aberration, or even insanity.

All persons are prima facie competent to testify except those § 491.060, RSMo 1978 (current version of § 491.060, RSMo Supp.1985) renders incompetent. *McCrary v. Ogden*, 267 S.W.2d 670, 672[1–3] (Mo.1954). On general principle, a person who, at the time of production for examination, understands the nature of an oath and demonstrates a mental capacity sufficient to observe, recollect and narrate the things heard and seen is competent to testify. *McClain v. State*, 560 S.W.2d 894, 896[4, 5] (Mo.App.1978). The determina-

the discretionary power to enter just such an order in a sex offense case, or of its prevalence. The peremptory tone of opinion, moreover, extends to deny a trial court the power to order a witness in *any* criminal case to submit to a psychiatric examination for *any* purpose. The motion of a defendant in a criminal case to submit a witness to a test for *competency* [rather than for credibility], however, is not a probe for evidence and discovery, but of testimonial capacity—whether the witness is lawfully fit to testify at all. Therefore, the want of a statute or rule of *discovery* cannot preclude a court from its quintessential trial function to determine the want of competency of a witness to give testimony under Persons Incompetent to Testify § 491.-060, RSMo 1978 (current version at § 491.060, RSMo Supp.1985). The opinion is rendered without mention of the decisions by our supreme court in *Cox* and *Oswald* which, although they deny to a defendant the psychiatric examination on the *competency* of a witness *as a matter of right*, gives every countenance to such a motion and intimates the grant of such a request in a case where the "interests of justice more than counterbalance the ... value of such an examination." *State v. Wilson*, 233 S.W.2d at 689[11]. *See also State v. Oswald*, 306 S.W.2d at 563[7–9].

The disposition of the point before us on appeal does not require that we confront the validity of such a preclusive principle. We note only that the thoughtfully wrought decisions of virtually *all* jurisdictions which have considered the essential question recognize just such a discretion in a trial court to protect the integrity of the fact-finding in a criminal case—the want of a rule or statute notwithstanding.

tion of the competency of a witness to give testimony in any case is for the trial court as a matter of discretion and will not be disturbed except for abuse of that exercise. *State v. Robertson*, 480 S.W.2d 845, 846[1–3] (Mo.1972); *State v. Oswald*, 306 S.W.2d 559, 563[7–9] (Mo.1957).

◼◼◼ The *pro se* initiative to submit the competency of prosecution witness Bobbie Jean Moore to an involuntary psychiatric examination rests on the representations that her testimony at the first trial was "contradictory to the physical evidence," that her testimony was by a person "mentally deranged or something," and that the proposed witness had been "drinking and doing narcotics the night before" the incident she was called to describe. We note, at outset, that allegations of incompetency do not constitute proof of the fact. *State v. Cox*, 352 S.W.2d at 672[18–20]. Our discussion assumes that the Bobbie Jean Moore testimony of the first trial was before the trial court at this threshold of the second trial and was tendered to sustain the allusions of incompetency asserted against Bobbie Jean Moore *pro se*. In the review of the competency determination by the trial court, we look not only to the presentation at the preliminary examination [and hence to those aspects of the testimony of the witness given at the first trial], but also to the testimony of the witness at the trial under review. *State v. Robertson*, 480 S.W.2d at 846[1–3]. That review discloses internal contradictions in the testimony of witness Moore—and hence, a cause to question credibility—but no contradiction of physical evidence. That testimony may be contrary to physical fact, nevertheless, does not render the witness incompetent, but merely affects credibility and the weight the trier of fact chooses to accord that testimony. *McCrary v. Ogden*, 267 S.W.2d at 674. Nor does a condition of habitual drunkenness [*State v. Brown*, 360 Mo. 104, 227 S.W.2d 646, 649[2] (1950)], or of addiction to narcotics [*State v. Cox*, 352 S.W.2d at 672[18–20], or of mental deficiency [*McCrary v. Ogden*, 267 S.W.2d at 672[1–3], *simpliciter*, overcome the presumption of competency of such a person

to give testimony. And even the unsoundness of mind which renders a person unfit as a witness under § 491.060(1), RSMo 1978 [since enacted as "mentally incapacitated," § 491.060(1), RSMo Cum.Supp.1984] appertains only to a person adjudicated as such [*State v. Darty*, 619 S.W.2d 750, 751[2] (Mo.App.1981) ] and not to a witness who—as the *pro se* defendant intimates of Bobbie Jean—renders a bizarre narrative of the events.

◼◼◼ The *pro se* assertions did not suffice, prima facie, to induce the trial court into further inquiry as to competency of the witness. A review of the evidence before the court at the time of the motion, and then the record of the retrial, confirms that witness Bobbie Jean Moore understood the nature of the oath, demonstrated a mental capacity sufficient to observe, recollect and narrate the things heard and seen, and so was a competent witness. The proceedings confirm, therefore, the response by the trial court that the *pro se* complaints were matters of credibility for the jury, and not of competency for the court. The order the *pro se* motion contemplated, moreover, was not merely an inquiry into the competency of the prosecution witness to give testimony, but to compel her to a psychiatric examination whatever her disposition to such a regimen. It was an overture, which, if granted would tend to encroach on the right to privacy, to discourage the public readiness to testify, and even to unduly harass. It is for these reasons, that such an order does not issue as of right [*State v. Oswald*, 306 S.W.2d at 563[7–9]; *Commonwealth v. Gibbons*, 393 N.E.2d at 405[9]], but only on " 'compelling need' " asserted and proven [*id.* at 405], and an end of justice, on balance, found and subserved. *Oswald*, 306 S.W.2d at 563[7–9]. The *pro se* motion asserted no colorable ground for inquiry into the competency of Bobbie Jean Moore to testify and, *a fortiori*, no colorable ground for an order to subject the witness to a psychiatric test of competency.

### The Refusal of the Pro Se Request for Continuance

In the course of the diffuse colloquy among the court, counsel and the defendant prior to the administration of the oath to the venire, Johnson—as permitted by the court—not only made request for the psychiatric examination of witness Bobbie Jean Moore, but also announced unreadiness to proceed to trial. The defendant gave as reason that there was a "lack of preparation" by counsel: that several witnesses Johnson deemed important to the defense were neither interviewed nor under subpoena to testify. These were persons, Johnson explained, not called at the first trial, nor ever "contacted by the State nor the defense or the police department." They were nine in all, and it was the declared intention of defense counsel to call only three of them—and then only if the developments at the trial and the best interests of the client warranted the presentation of those witnesses. Johnson could not say where the witnesses were ["I don't even know where they are"], nor was there intimation of what they would say—other than they were not intended to prove the alibi defense ["None of those are alibi witnesses"], nor of the materiality and relevance of their testimony to the trial of the offenses charged against Johnson. One of them—Harvey—in fact was presented as a witness and his testimony was excluded by the trial court as not relevant. Counsel for the defense attempted to locate witnesses Alexander and McClooney [alibi witnesses, in fact], and continued the search, but to no avail. The continued attempt to locate Barbara Courtney, a third potential witness, jailed in Jefferson City but then released, also had not yet availed. Those three, according to the comment to the court by defense counsel, were the "important witnesses in this case."

Counsel for the defense posed the question to the court, not as one of unreadiness for trial, but of a variance between the attorney and client as to the management of the trial—the call of witnesses, included:

There is a basic disagreement between myself and Mr. Johnson on what should be presented and how the trial should be tried. I'm going to go with my own judgment. It's just that simple. I cannot try a case, I don't think, afraid of what's going to happen down the road. I must deal with Mr. Johnson's best interests. There's been a breakdown. I advised the Court of this.

The next day, after the jury was impaneled counsel for the defendant—prompted by the continued displeasure of the defendant with his advocacy—moved the court to allow withdrawal from the case, but the court refused. Then also, before the presentation of any witness, defendant Johnson reasserted the matter of witness, this time, in terms of the denial of a fair trial. The court understood this attenuated presentation as a *pro se* motion for a continuance, and responded:

I realize, from listening to what you had to say yesterday and what Mr. White [defense counsel] had to say yesterday, that there's disagreement as to whether or not those witnesses are even important, as to whether or not they have relevant evidence, as to whether or not they would or would not help your case. You feel they would, and I understand Mr. White, from what he said yesterday, feels that, based upon his knowledge, they would do more damage to you than they would—....

The court then denied the *pro se* motion for the enumerated reasons: the request was not timely, since the names of the putative witnesses were known for a long time; that the essential evidence expected from the witnesses was not shown; and that the "value of the testimony or its relevance" was not disclosed.

On appeal, Johnson poses the error as the denial of continuance despite a demonstrable lack of preparation for trial in that counsel failed his duty "to interview witnesses with potentially exculpatory evidence." The defendant argued to the trial court, as does appeal counsel now on review, that the decision by trial counsel not

to consider as witnesses because they would not be helpful, six of the nine persons proposed by Johnson, without ever an attempt to interview them, bespeaks inadequate preparation and breach of professional duty. And, indeed, the drawn, and patiently indulged, *pro se* presentation became a litany of lawyer-ineffectiveness grievance as to numerous aspects of the professional services. The point on appeal, as posed, assumes the tenor of a complaint of ineffective assistance of counsel. The trial court refused to intermeddle between the contention of want of preparedness, on the one side, and the prerogative to manage the trial, on the other, and denied continuance for the reasons, as expressed, that whatever the validity of that complaint, there was no demonstration that the witnesses were available, could be found, or even had something germane to say.

■ We, too, refuse to determine the validity of the lawyer-performance complaint in the assessment of the claim that the denial of the continuance was a trial error, for two reasons. A direct appeal from a criminal conviction is not the usual means for the presentation of a claim of ineffective assistance of counsel. *State v. Locke,* 587 S.W.2d 346, 350[5, 7] (Mo.App. 1979). That is because the record on appeal reports the trial proceedings, and not the preparations, strategies and client-attorney interrelationships antecedent to the trial. It may be that a claim of ineffective assistance of counsel rests on a trial incident, and so is reported in the record. In such an instance, the claim of ineffective assistance of counsel may be raised as error on direct appeal—but even then, only if the record is fully developed as to that ground of claim. *Id.* at 350[5–7]; *State v. Phillips,* 460 S.W.2d 567, 569[3] (Mo.1970). Otherwise, and as is usual, the validity of such a ground of relief from conviction and sentence is by Rule 27.26. *State v. Lindley,* 545 S.W.2d 669, 671 (Mo.App.1976). The record before us, although rife and lengthy with complaint of ineffective representation, is not ample for the review the point of error invites. The complaint of ineffective assistance of counsel was perva-

sive, not isolated. And the claim for continuance because of neglect of witnesses [hence lack of lawyer preparedness for trial] somehow became entangled, in the *pro se* exposition to the court, with yet another complaint: that between the first trial and the retrial counsel was granted a continuance unsought by the defendant, a delay which rendered it even more difficult to locate the witnesses the defendant proposed counsel locate, interview and call. The response of counsel, among the others in this protracted presentation, was simply that he, as a private counsel appointed to represent the defendant was financially unable to undertake the investigation necessary to locate even those witnesses he deemed helpful to the defense, until he could find an investigator and receive an advance payment of expense money. These comments, complaints, accusations and explanations, were—none of them— given as testimony. They were random and unsworn. In this ambiguous posture of complaint and riposte, it would disserve both any merit the claim bears as well as the integrity of a professional reputation by our review on direct appeal of the issue of ineffective assistance of counsel on less than a fully developed record. The means for that exploration is by the Rule 27.26 procedure. *State v. Lindley,* 545 S.W.2d at 671[3–5].

■ The other reason we refuse review of that issue on direct appeal is cognate. To prove an allegation of ineffective assistance of counsel, on the ground that the trial attorney did not adequately attempt to locate, interview and present trial witnesses, the defendant must show that the witnesses could have been located through reasonable investigation, would have testified if called, and that the testimony would have proven a defense. *Hogshooter v. State,* 681 S.W.2d 20, 21[1, 2] (Mo.App. 1984). The record before us presents only contention and countercontention, narrative and explanations, but no proof that the witnesses proposed by the defendant Johnson were even available—and nothing as to

their readiness to give testimony and its quality.

■■■■ It is for those very reasons, moreover, that the trial court denied the *pro se* request for a continuance for additional time to find, interview and present the witnesses proposed by Johnson. It is for those very reasons, as well, that we approve and affirm the decision. The trial court has broad discretion to grant or deny a request of continuance. *Phillips v. State*, 639 S.W.2d 270, 275 (Mo.App.1982). Unless a party who requests a continuance because of an unavailable witness shows the materiality of the evidence sought from the absent witness and the particular facts the witness will prove, a trial court does not abuse its discretion by the refusal to grant the request. *Smith v. State*, 674 S.W.2d 638, 640[2] (Mo.App.1984). Those prerequisites lacked altogether, and the trial court acted within a proper discretion to deny the *pro se* request for continuance.

### *The Failure to Instruct the Jury by MAI–CR 2d 1.08 As Plain Error*

■■■ The trial was recessed at the conclusion of the prosecution case, and the jury conducted to a place for lunch by a court official. MAI–CR2d 1.08(a) requires that in the trial of a criminal offense, the court instruct the jury at the first recess or adjournment that until the case was given to them for verdict, the jury not discuss the case among themselves, with others, or permit discussion within their hearing. MAI–CR2d 1.08(b) requires that the court remind the jury of that admonition at every subsequent recess or adjournment. The court allowed the jury to recess for lunch on the fourth day of the trial without the reminder instruction of MAI–CR2d 1.08(b), and that neglect went unnoticed. The full admonition of MAI–CR2d 1.08(a) was given at the threshold of the first recess as required, and the reminder admonition of MAI–CR2d 1.08(b) was given at every subsequent recess or adjournment thereafter, except on the occasion of the interruption for lunch on the fourth day of the trial. The defendant contends that lapse was error—and since the event went without objection—he contends that lapse was plain error.

The record is clear that the jury was not reminded of the admonition MAI–CR2d 1.08(b) prescribes for subsequent recesses or adjournments. The record is clear also that the defendant neither objected to that oversight nor brought it to the attention of the court. Notes on Use to MAI–CR2d 1.08, ¶ 3, informs that if the court overlooks the reminder instruction, "it is the duty of counsel to remind the court to give it." The court was not reminded, nor did counsel otherwise request that the court read the reminder component of MAI–CR2d 1.08 to the jury at the time the recess for lunch was taken. The want of reminder or request by counsel to the court—in view of the peremptory duty the Notes on Use impose—constitutes a waiver of any point that the oversight to instruct was error. *State v. Chunn*, 701 S.W.2d 578, 588[12] (Mo.App.1985).

### *The Admission of the Testimony of Jerome Minor as an Abuse of Discretion*

■■■ The defense was alibi, and the testimony of the defendant Johnson, Vivian Alexander, and Lawrence McClooney was presented to make that proof. It was the testimony of the defendant Johnson, confirmed by Vivian Alexander, that on August 18, 1976 Johnson drove to the Alexander residence to deliver her to Church's Fried Chicken at 7th and Quindaro, in Kansas City, Kansas, to make application for employment—and while there to transact some personal business with McClooney. Johnson met Alexander at about 10:30 a.m. that day and arrived at Church's soon thereafter, presumably—at about the hour of the homicides. McClooney recalled he saw Johnson at about 1:30 a.m. on that day and Johnson told him then he had "dropped a young lady off who was filling out an application at Church's Chicken."

The prosecution called Jerome Minor in rebuttal. In August of 1976, the date of the homicides, Minor was the manager of

Church's Fried Chicken at 27th and Quindaro. In February of 1977, he became manager of Church's Fried Chicken at 7th and Quindaro, and remained as manager there for three years. Minor testified that Church's Fried Chicken observed a common policy at both establishments concerning employment applications. The applicant completed the form and inserted the date, and the manager then noted the date of the interview on the form. The application was then placed on file at the premises, and as policy required, was kept there for three years. After the witness was transferred as manager of the 27th and Quindaro to the 7th and Quindaro site in February of 1977, he took over the interview of applicants for employment there and assumed custody of the applications on file at the 7th and Quindaro site for more than three years. Thus, the forms already on file [that is, for the three years preceding—a period which would have included an employment application taken there on August 18, 1976] were among those records which came under his custody and management.

Minor at the first trial of April, 1978 produced the employment application forms in the files at the 7th and Quindaro Church's Fried Chicken establishment. Those files would have included applications for employment taken in 1976. The forms were restored to the 7th and Quindaro files at the conclusion of the first trial and, in the usual course, thereafter those more than three years old were culled. Thus, by the time of the retrial in 1982, the application forms for 1976 were discarded. Minor, the memory refreshed by a review of the transcript of his testimony at the first trial, testified that his search of the employment records in 1978 disclosed application forms made in 1976. Minor found among those applications for the month of August, 1976, but none for August 18, 1976 and none made out by a Vivian Alexander, although he specifically searched to find one by her.

The defendant argues that this testimony was tantamount to the reception into evidence of the records themselves, and

since—for a number of reasons—did not qualify as competent evidence under the Uniform Business Records as Evidence Law [§ 490.680, RSMo 1978], the testimony was improperly received. That section, by its terms, applies only to records and renders them competent as evidence, as an exception to the hearsay rule, when they meet with the statutory qualifications. *Bohn v. James,* 573 S.W.2d 448, 450[2–5] (Mo.App.1978). The testimony of witness Minor was not a tender of records. There were no records, they had by then been discarded. The testimony of Minor, rather, was original evidence based on personal knowledge and observation: that his examination in April of 1978 of the employment applications on file at the 7th and Quindaro outlet disclosed none made out by Vivian Alexander on August 18, 1976, during August of 1976, or during any of the three-year record period from 1978. The testimony was responsive to the alibi defense that at the time of the alleged homicides Johnson was in the company of Alexander and had transported her to another city to seek employment at the 7th and Quindaro site. It was direct evidence as to a fact in issue based upon personal knowledge—that is, the nonexistence of the purported record—and hence admissible. *State v. Quinn,* 594 S.W.2d 599, 603[9] (Mo. banc 1980).

### *Plain Error in the Admission of the Hamilton Testimony*

In the course of the prosecution case, Abbie Hamilton testified that on the morning of August 18, 1976, a woman [Bobbie Jean Moore] came to her house accoutered in a maroon pajama top. The hands of the woman were taped behind her back, and her head was bleeding from an injury. Abbie Hamilton freed the hands of the woman and allowed her the use of the telephone to call the police. The prosecutor then displayed to her a garment marked as Exhibit 24 and put these questions, and elicited these answers:

Q. Would you please identify it for us?

A. That's what she had on.

Q. Does it appear to be the same pajama top as the one the woman was wearing?

A. Uh-huh.

Counsel for the defendant then cross-examined:

Q. Do you know whether or not this is the same pajama top or is it—you don't really know if it's the same one, do you?

A. Looks like the same one.

Q. Just looks like it is all?

A. Uh-huh—

Q. It could be another one, I guess?

A. I guess.

These colloquies came before the jury without objection. Then, at the conclusion of the prosecution evidence, court and counsel considered a number of items, marked as exhibits, but never formally tendered into evidence, and received some of them, but excluded Exhibit 24—the maroon pajama top. The defendant then, for the first time objected to the admission of the item marked as an exhibit on the ground that since witness Hamilton testified that the maroon pajama top displayed to her "looked like the same thing" and not "that it was the same thing," no foundation for the admission of the pajama shop had been shown.

■ On this appeal, the defendants ask our review for plain error under Rule 29.12(b) on the ground that the testimony about an exhibit "crucial to the State's case," but never in evidence, occasioned manifest injustice to him. To confirm the contention of prejudice, defendant asks us to take judicial notice of the transcript of the proceedings on the first appeal where— the defendant asserts—the tender of the pajama top as evidence by the prosecution was rejected because the garment had been altered since the occurrence. A court of review may, of course, notice its own records in the same case. *Bennett v. Metropolis Publishing Co.,* 148 S.W.2d 109, 110[3, 4] (Mo.App.1941). A court of review, when justice requires, may give effect to its own records in a prior, but interrelated proceeding to a pendent appeal. *Mince v. Mince,* 481 S.W.2d 610, 614[9–14] (Mo.App.1972). The applicability of the rule of judicial notice apart [in a case, such as this, where the appeal, although lodged in the court of appeals was ultimately decided by the supreme court en banc as an original appeal so that the proceedings are not a record of this court— *State v. Johnson,* 606 S.W.2d 624 (Mo. banc 1980) ], the denial by the trial court to receive the pajama top as an exhibit granted the defendant more than the complaint deserved. The pajama top was sufficiently identified as the garment worn by witness Moore at the time she appeared at the Hamilton residence to seek help to properly qualify as an exhibit, and admissible evidence at the trial. That the unconditional response by the witness on direct examination: "That's what she had on" was then moderated to: "Looks like the same one" on cross-examination, does not render the testimony incompetent, but only raises a question of credibility, and hence, weight. *State v. Ridinger,* 589 S.W.2d 110, 112[3, 4] (Mo.App.1979). Nor does the admissibility of an exhibit depend upon a proof of a demonstrably unbroken chain of custody where the object of the proof is the exhibit itself, and not its condition. *State v. Coleman,* 441 S.W.2d 46, 51[6, 7] (Mo.1969). The reception of the testimony by witness Hamilton that Moore was garbed in a maroon pajama top on the event described was not manifestly unjust and not plain error.

*The Reception of the Testimony of Officer Davis and of the Hospital Records as Plain Error, or, Alternatively, as Ineffective Assistance of Counsel*

The defendant caused a commotion in the courtroom after the impanelment of the jury, and was excluded from the proceeding. He was later returned, upon his assurance of controlled conduct. In the interim, Officer Davis testified. After the defendant was returned to the courtroom, trial counsel informed Johnson that Davis had given testimony that Bobbie Jean Moore had identified the defendant to him

as the assailant. Johnson promptly pressed counsel to move for a mistrial on the ground that the Davis testimony was hearsay under *State v. Degraffenreid* [477 S.W.2d 57 (Mo. banc 1972)]. Counsel acceded, but only as a gesture to the defendant. Counsel accompanied the mistrial motion with the explanation to the court that it was his deliberate trial decision to allow the Davis testimony about the Bobbie Jean Moore utterance to come in without objection, as a tactic favorable to the defense. The court denied the mistrial motion, and the trial proceeded.

The charges against Johnson had already been tried once, therefore the manner in which the evidence was to unfold was expected. The contention the defendant asserts to us for plain error review is best understood in that perspective, Counsel for the defendant anticipated that Officer Davis would answer—if the question was asked as to what Bobbie Jean Moore told him as to who shot Donald Dumas and Loretta Minor, and if the question went without objection—that it was Cornelius Johnson. Counsel for the defendant anticipated also that on cross-examination Officer Davis would acknowledge that Bobbie Jean Moore also told him that Cornelius Johnson shot Dumas, but that someone else shot Minor. Counsel for the defendant anticipated also that Bobbie Jean Moore would insist that she never told Officer Davis that someone other than Johnson shot Loretta Minor, and if Officer Davis said so "he would be lying." As counsel for the defendant explained to the court on the motion for mistrial: "I wanted V.L. Davis to testify. I wanted him to testify early, because the evidence will be exceedingly conflicting between what Bobbie Jean Moore says and what Officer Davis said." And, in fact, that was precisely how the testimony developed.

The defendant argues that the Davis testimony was hearsay, and that concurrence by trial counsel with the prosecutor that the identification testimony could be elicited on direct examination without objection by the defense could not bind the person of the defendant without his waiver, and so was plain error. The defendant argues, alternatively, that the failure to object to testimony clearly inadmissible—and prejudicial—constitutes a ground for ineffective assistance of counsel.

It is foregone that *Degraffenreid* rendered hearsay, and inadmissible upon objection, the testimony of a third person that a witness made an extrajudicial identification of the defendant—and, unless that evidence bore to impeach the identification witness, the testimony is also prejudicial.[7] The question, however, was not want of objection, and therefore not of trial error, or even of plain error. Defense counsel was plainly aware of the *Degraffenreid* principle, but nevertheless stipulated with the prosecution to allow the officer to render the identification of defendant Johnson by witness Bobbie Jean Moore for a strategic end. That end—as disclosed to the trial court—was to present occasion at the very outset of the trial [Officer Davis was the very first witness presented by the prosecution] to instill a tone of unreliability and doubt as to the identification testimony of Bobbie Jean Moore, and therefore of impeachment of that indispensible prosecution witness, yet to come. It was not a matter of want of objection and trial lapse, therefore, but—if a matter at all—of trial strategy. That is because a client is not only bound by the decisions of the attorney as to the management of the trial and as to the stipulations which give effect to that strategy [*State v. Fitzpatrick*, 676 S.W.2d 831, 836[13] (Mo. banc 1984)], but also because a stipulation of counsel, deliberately wrought and then given effect, binds not only the client but—as the orderly administration of justice demands—is given credit by a court of review [*Hemp-*

---

7. The principle of *State v. Degraffenreid*, 477 S.W.2d 57 (Mo. banc 1972) the appellant asserts in argument was overruled since the submission of this appeal by *State v. Harris*, 711 S.W.2d 881 (Mo. banc 1986). Our opinion does not respond in terms of *Degraffenreid*, in any event, but in terms of ineffective trial strategy, and hence ineffective assistance of counsel.

*hill v. State,* 566 S.W.2d 200, 204 (Mo. banc 1978)].

The defendant does not contest the objective intended by the strategy, but argues that "the use of the inadmissible hearsay [of Officer Davis] to be heard before the declaring witness [Bobbie Jean Moore] made her appear more credible." That argument is pure cavil. The defendant acknowledges the self-evident: that the testimony of the essential prosecution witness Bobbie Jean Moore was vulnerable to impeachment. She had testified—and predictably would testify again—that the defendant Johnson, and no one else, shot both Dumas and Minor. She reported to Officer Davis within fifteen minutes or so of the event, however, that Johnson shot only Dumas and that someone else had shot Minor. Therefore, it was a question only when the impeachment would have occasion. It was the considered tactic of trial counsel to sow doubt as to the integrity of the identification at the outset through prosecution witness Officer Davis, rather than to defer the probe of the contradictions until Bobbie Jean Moore took the stand [virtually at the very end of the prosecution case]. That choice of procedure was in every sense a trial strategy, and the *post facto* complaint, that "the affect [sic] of allowing the use of the inadmissible hearsay to be heard before the declaring witness made her appear more credible," has no logic to commend it.

■ The defendant argues that reasonable attorney conduct requires that a trial decision to allow evidence clearly inadmissible to come in without objection for a strategic end be concluded only in consultation with the client. The authority to make certain fundamental decisions in the case— whether to plead guilty, waive a jury, take the stand to testify, or to take an appeal— reposes in the accused. *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983). The other decisions an attorney must make during the course of a trial, from very necessity, are for the attorney alone, even without the advice or consultation of the client. *Wainwright v. Sykes,* 433 U.S. 72, 93, 97 S.Ct. 2497, 2509,

53 L.Ed.2d 594 (1977). The defendant Johnson, in any event, by a brazen, blatant and boisterous display of discourtesy to the judge and tribunal, induced his removal from the courtroom during the time the testimony of Officer Davis [which he now complains disserved his best interests] was allowed in without objection from defense counsel. It was his own antics which placed the defendant beyond the reach of counsel and consultation.

■ As our opinion notes, a direct appeal from a conviction is not the usual means to adjudicate a claim of ineffective assistance of counsel. *State v. Locke,* 587 S.W.2d at 350. The record before us on the particular complaint of trial lawyer performance, so defective as to amount to denial of a fair trial, however, suffices for the review and decision usually assigned to the Rule 27.26 remedy. *See State v. Quillun,* 570 S.W.2d 767, 769[2] (Mo.App.1978). To prove the ineffective assistance of counsel contention, the defendant must show a deficient performance and that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The deficiency is shown by acts or omissions of counsel which, in the light of all the circumstances, were "outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066. The prejudice is shown by proof that, but for the unprofessional errors, there was a reasonable probability that the result of the proceeding would have been different— that is, "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. A cogent presumption that counsel rendered adequate services and exercised a reasonable professional judgment in all decisions attends that assessment. *Id.* at 690, 104 S.Ct. at 2066.

■ There is nothing in the record to overcome the presumption that the decision of trial counsel to allow the Officer Davis testimony was a reasonable tactic towards the strategy to put the credibility of Bobbie Jean Moore in doubt at the very outset of the proceedings. It was an exercise well

within that broad latitude allowed a counsel in the conduct of a defense. *Jones v. State,* 598 S.W.2d 595, 597[10] (Mo.App. 1980).

■ The defendant contends also that the stipulation by trial counsel to allow the prosecutor to read to the jury, without further qualification, portions of the hospital records of the treatment accorded Bobbie Jean Moore following the infliction of the gunshot wound was an incident of ineffective assistance, and its allowance by the court, plain error. · Hospital records readily qualify as business records, and hence as evidence, under the Uniform Business Records as Evidence Law [§ 490.680, RSMo 1978]; *State v. Triplett,* 520 S.W.2d 166, 168 (Mo.App.1975). Therefore, the admission of those records upon their identification and qualification by the custodian was foregone. The agreement to dispense with that perfunctory, albeit essential, formality could not have prejudiced the defendant—nor does he show any. The agreement by defense counsel to waive the qualification of the records by the custodian did not impair the right to object to the contents, and, in fact, portions of the entries were kept from the jury in response to such objections.

The defendant cites Rule 24.12 to argue that the decision of the court to give effect to the stipulation to waive the qualification of the hospital records by the custodian was in violation of Rule 24.12, and therefore error. That rule provides:

Misdemeanors or Felonies—Pretrial Conference

At any time after the filing of the indictment or information the court upon motion of any party or upon its own motion may order one or more conferences to consider such matters as will promote a fair and expeditious trial. The court shall make a record of the matters agreed upon. No admission made by the defendant or his attorney at a conference shall be used against the defendant unless the admissions are reduced to writing and signed by the defendant and his attorney. This Rule shall not be invoked unless the defendant is represented by counsel.

The obvious subject of that text is an *admission* by a defendant or his attorney at a pretrial conference, and not a *stipulation* or agreement by counsel as to the call of witnesses, or the presentation of evidence, or any of the incidences of procedure at the trial.

The stipulation to dispense with the witness of the custodian and deem the hospital records qualified did not amount to ineffective assistance of counsel, nor was the order of the court to give the stipulation effect plain error.

The judgment is affirmed.

All concur.