STATE of Missouri,
Plaintiff–Respondent,

v.

Howard C. HARRIS,
Defendant–Appellant.

No. 54710.

Missouri Court of Appeals,
Eastern District,
Division Five.

June 6, 1989.
Rehearing Denied July 11, 1989.

Arthur S. Margulis, Stephanie J. Kraus, Clayton, for defendant-appellant.

William L. Webster, Atty. Gen., Ronald L. Jurgeson, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

CARL R. GAERTNER, Judge.

Appellant was found guilty in a judge-tried trial of forcible rape, kidnapping, two counts of armed criminal action and of first degree assault. He was sentenced to life imprisonment on the assault count and fifty concurrent years on the related armed criminal action count. He was sentenced to fifteen consecutive years on the kidnapping count, thirty consecutive years on the forcible rape count and ten consecutive years on the related armed criminal action count, a total of 105 years concurrent with life imprisonment. Appellant asserts four points on appeal: 1) insufficiency of the evidence to establish intent because of his mental disease, 2) error in denying the motion to suppress appellant's statements, 3) error in overruling his objection to evidence of unrelated crimes, and 4) ineffective assistance of counsel in proceeding to try his case without a jury before a judge who had expressed reservations about the defense of mental disease or defect. We affirm.

Appellant had been engaged to marry Magnolia Brown, one of two victims in this case. Ms. Brown broke off the engagement in early February 1987, despite appellant's wishes to the contrary. Brown testified that beginning February 6, after the break-up, appellant exhibited peculiar behavior. For example, appellant telephoned Brown Friday, February 6, but the conversation "didn't make sense," because appellant "jumped from one subject to another". Brown went and picked up appellant and took him to her house at approximately 1:00 a.m. and observed appellant talking to his shoes and to different objects in her home. The next morning Brown found four empty sleeping pill bottles, and appellant informed her that he was trying to commit suicide because Brown had broken up with him. Appellant also stated that he had seen a catalog falling from the ceiling of the house.

Appellant's mother, Judy Harris, testified that on Saturday appellant acted strange, which prompted her to schedule an appointment for appellant at a mental health clinic for the following Monday. On Saturday, February 7, appellant spent the night at Brown's house. However, Brown testified that that night appellant exhibited none of the behavior of the previous night.

On Sunday while the two were driving appellant pulled a knife out from under the car seat, held it to Ms. Brown's side and begged her to take him to his grandmother's house in East St. Louis, Illinois. She refused and appellant cut her arm, so she complied. Appellant told Brown to park the car and he raped her. Appellant directed her to drive to Cape Girardeau where appellant attempted to call Kirk Menard, his roommate during college at Southeast Missouri State University, who appellant believed lived in Cape Girardeau. They drove to the Menard house and appellant put Brown in the trunk of the car. Brown stated that she began kicking and screaming so appellant moved her to the back seat and tied her up with a seat belt. Appellant

went into the house and talked to Mr. and Mrs. Menard for approximately twenty minutes, found out Kirk Menard actually lived in St. Louis County, and then returned with Brown to St. Louis. They stopped in East St. Louis and appellant again raped Brown.

Upon arriving in St. Louis at approximately 2:00 a.m. Monday, February 9, they went to a motel in St. Louis where appellant again raped Brown. They left the motel at approximately 5:30 a.m. Brown testified that appellant never talked to himself or inanimate objects, and never acted disoriented or confused during this entire trip. Appellant then called Kirk Menard, and they drove to Menard's apartment. They arrived at approximately 6:00 a.m. and talked with Menard and his wife, Judith. At approximately 8:00 a.m. Menard took his wife to work, leaving appellant and Brown in the apartment. Appellant gave Brown a bath, and then raped her again. Brown recounted that appellant heard Menard returning, hid behind the door with a hammer and started hitting Menard on the head with the hammer, which caused Menard to go into convulsions. Appellant ordered Brown to gather some toiletries from Menard's bathroom and place them in a bag. Appellant placed the hammer in the bag. Appellant then took Menard's wallet, asked him for the account numbers to credit cards and an automatic bank card, tied his legs because he was convulsing, and gagged him to prevent him from swallowing his tongue. Appellant and Ms. Brown then left the apartment. Brown told appellant she needed her purse, so appellant went to retrieve it. Brown drove off in Menard's car, and received help at an apartment complex.

Dan Merritt, a hotel manager, testified that he and a desk clerk encountered appellant following these events, and that he called the police because appellant seemed confused. Officer James Potts arrested appellant at the hotel. He testified that at the time of the arrest appellant's eyes were glassy but that appellant never acted confused or disoriented. Appellant was able to answer all questions regarding identification and was cooperative, but moved somewhat slowly.

Detective William Ostendorf testified that he conducted an on-scene investigation and talked to appellant after the arrest. He stated that he informed appellant he was a police officer, provided appellant with a *Miranda* waiver form, read appellant his *Miranda* rights and that appellant signed the waiver. Prior to this Ostendorf had talked to Brown, who informed Ostendorf that appellant had been acting strange Friday night and early Saturday, that she had found empty sleeping pill boxes, and that appellant had threatened to take some sleeping pills. At no time did appellant act confused or disoriented. Ostendorf stated that appellant's statement of events was substantially the same as what Brown had previously recounted to Ostendorf, and that appellant had no difficulty recalling the events. Appellant also told Ostendorf that appellant's brother had recently committed suicide and that appellant was returning from his brother's funeral, when his brother had actually committed suicide several months earlier. Appellant said that he had not slept or eaten within the past week, but was not hungry and did not appear tired.

Appellant was charged with ten counts and convicted of five, all involving acts allegedly committed at Kirk Menard's apartment. The convictions were for first degree assault and armed criminal action in striking Kirk Menard, and rape, kidnapping and armed criminal action arising from the rape of Ms. Brown in Menard's apartment. Appellant raises four points. In the first point, which we now address, he asserts that the court erroneously denied appellant's motion for acquittal at the close of the evidence because the prosecution failed to establish that appellant had the requisite intent to commit the crimes charged, as the State's evidence did not rebut the defense of mental disease or defect, which appellant injected into the case.

Appellant invoked the defense of mental disease or defect, pursuant to § 552.030.6 RSMo.1986, and requested a psychiatric examination. The defense called a psycholo-

gist and a psychiatrist who both testified that appellant suffered from paranoid schizophrenia at the time of the alleged incidents, which made him unable to appreciate the nature of his actions. Dr. Michael Armour, a clinical psychologist at Malcolm Bliss Mental Health Center, examined appellant for approximately four hours on June 2nd and 16th, 1987, and reviewed a police report and a social worker's report. In forming his opinion that appellant suffered from paranoid schizophrenia, Dr. Armour considered appellant's description of his behavior at the time of the incidents, the information provided in the social history, appellant's deteriorated hygiene (as testified to by his mother) and belief that his brother was still alive and talking to him. Dr. Armour explained that some schizophrenics have "compartmentalized" delusions, so that the delusions relate to very narrow segments of their beliefs and may not manifest themselves in normal conversation.

Dr. Sam Parwatikar, a psychiatrist in private practice, testified and also concluded that appellant was suffering from paranoid schizophrenia and was unable to appreciate the nature of his actions. Dr. Parwatikar examined appellant on November 9, 1987 and January 1, 1988 for approximately four hours. Dr. Parwatikar examined and talked with appellant and his parents and reviewed the reports of Dr. Armour and Dr. Joseph Shuman, the State's rebuttal expert. In support of this diagnosis Dr. Parwatikar cited appellant's sudden behavioral changes, such as his dropping out of college, slovenly appearance, disappearance from home on two occasions for one to two weeks, once while in high school and once after he quit college, belief that his brother was still alive, and a problem "relating" to people, especially his girlfriend. Dr. Parwatikar also explained in detail appellant's expressed belief that he could communicate with his brother, because appellant had been chosen a member of an organization called the "Federation", which was established to help the world. Appellant had not mentioned this organization to Dr. Armour.

The State called Dr. Joseph Shuman as a rebuttal witness regarding appellant's mental capacity. Dr. Shuman examined appellant on October 21, 1987. Dr. Shuman's testimony was substantially similar to that of Drs. Armour and Parwatikar, including appellant's beliefs about the "Federation". Dr. Shuman, however, suspected that appellant had fabricated the account that he believed his brother was still alive. In the event appellant was actually experiencing delusions, Dr. Shuman nevertheless would have concluded that appellant was capable of appreciating the nature of his acts, because at most appellant was suffering from "monosymptomatic schizophrenia". With this disorder the delusions would not permeate appellant's thought processes, but would only affect his beliefs about his brother.

■ In a court-tried case the sufficiency of the evidence is determined by the same standard as in a jury-tried case. We must accept as true all evidence and reasonable inferences that support the judgment and disregard all contrary evidence and inferences. *State v. Placke*, 733 S.W.2d 847, 849 (Mo.App.1987). We may not weigh the evidence but we review the record only to ascertain whether there was sufficient evidence from which the trier of fact could reasonably have found the defendant guilty. *Id.*

■ Appellant's first point, that the State failed to present sufficient evidence of intent, is based upon appellant's contention that the evidence that he was suffering from a mental disease at the time of the offenses precluded any finding that he was capable of formulating the requisite intent to commit any of the charged criminal acts. It is not our function to determine the credibility of the witnesses or the weight to be given to their testimony. *State v. Buster*, 753 S.W.2d 118, 119 (Mo. App.1988). Despite evidence to the contrary, the trial court was free to accept the testimony of Dr. Shuman, which cast doubt upon the validity of appellant's symptoms and which positively asserted that if appellant was suffering from a mental disease it was not of such a nature as would affect

his ability to appreciate the wrongfulness of his acts or of conforming his behavior if he had so desired. Moreover, even in the absence of this expert testimony that appellant was not suffering from a mental disease excluding responsibility for his conduct, the statutory presumption of sanity, § 552.030.6, RSMo.1986, standing alone, is evidence sufficient to sustain the finding of the trier of fact on this issue. *State v. Lee*, 654 S.W.2d 876, 881 (Mo.banc 1983). Appellant's first point is denied.

In his next point appellant contends that the trial court erred in denying the motion to suppress the statements appellant made to Detective Ostendorf. Appellant claims that his confession was involuntary because at the time appellant was confused and disoriented, had taken sleeping pills and had gone without food or sleep for approximately one week. This rendered him incapable of confessing voluntarily.

There are several principles directing us on review. Initially, where the voluntariness of a confession is in question, the test is whether under the totality of circumstances the defendant was deprived of the free choice to admit, deny, or refuse to answer and whether physical or psychological coercion was present to such a degree that the defendant's will was overborne at the time he confessed. *State v. Lytle*, 715 S.W.2d 910, 915 (Mo.banc 1986). The State must prove voluntariness by a preponderance of the evidence. *State v. Flowers*, 592 S.W.2d 167, 168–69 (Mo.banc 1979). On appeal our role is to determine whether there was sufficient evidence to sustain the finding of voluntariness. Here we defer to the trial court's superior opportunity to evaluate and weigh conflicting evidence. *State v. Avery*, 724 S.W.2d 695, 697 (Mo.App.1987).

Generally, mental illness does not *per se* preclude the admission of a confession as long as the defendant is capable of understanding the meaning and consequences of his statements. It is but one of many factors to be considered. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986); *State v. Miller*, 714 S.W.2d 815, 822 (Mo.App.1986). In *Connelly*, the Supreme Court recognized that coercive police conduct must be present in order to render a confession involuntary. Mental illness, absent police overreaching, is insufficient. *Connelly, supra*, 107 S.Ct. at 520–22.

Considering Detective Ostendorf's testimony that appellant appeared calm, appellant accurately recounted the events similar to the version Ms. Brown had previously given Ostendorf, he initialled and signed the *Miranda* waiver form and did not seem confused about the nature of the *Miranda* rights, we are not persuaded that a mental disorder influenced appellant's confession. Admittedly, the waiving of these rights does not conclusively establish that a confession was voluntary, but it is nonetheless a significant consideration. *Lytle, supra*, 715 S.W.2d at 915; *State v. Craig*, 642 S.W.2d 98, 100 (Mo.banc 1982).

Appellant cites the evidence regarding his ingestion of sleeping pills, his weariness and vulnerability as indications of his lack of ability to voluntarily waive his *Miranda* rights. While such evidence may warrant consideration regarding the weight to be given to his statements it does not render them inadmissible. Moreover, the effect of such evidence is countered by appellant's ability to give a lucid and detailed account of the events which corresponded to the statements of others. Point denied.

Next appellant seeks reversal because of the admission of evidence of the rapes which occurred in Illinois, the felonious restraint of the owner of a car stolen by appellant and used to leave the area where he had assaulted Menard and raped Ms. Brown, and evidence of a computer fraud scheme with which he had been involved while in college. Appellant cites *State v. Caldwell*, 695 S.W.2d 484, 486 (Mo.App.1985) and argues the admission of these "uncharged and unrelated" crimes requires reversal because "the relevancy of the evidence was outweighed by the possible prejudicial effect."

The rapes occurring in other jurisdictions and the circumstances surrounding the

theft of the automobile were admissible as evidence of a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other. *State v. Kenley,* 693 S.W.2d 79, 81 (Mo.banc 1985). The evidence was simply the presentation of a complete picture of continuous, related events spanning a two-day period. *See State v. Bannister,* 680 S.W.2d 141, 147 (Mo.banc 1984).

 Regarding the computer scheme the evidence introduced by the State consisted of little more than that appellant had some trouble at school at Cape Girardeau because "supposedly, [appellant] was changing grades for money." Upon objection the assistant prosecuting attorney advised the court this evidence was offered in anticipation of the defense of mental disease to show that appellant's statements to a psychologist concerning his beliefs that he was being watched were not paranoid delusions, but had a basis in fact. For this purpose the questioning was permitted. During the defendant's case extensive evidence was adduced by defense counsel regarding the computer grade-altering scheme and appellant's belief he was under surveillance by people seeking money because of it. Under the circumstances, appellant sustained no prejudice. Moreover, even if the challenged evidence had been improperly admitted, it would not warrant reversal of a court-tried case as it is presumed the judge was not confused or misled by it. *State v. Turnbough,* 729 S.W.2d 37, 41 (Mo.App.1987). Point denied.

 Appellant's final point is a claim of ineffective assistance of trial counsel. Generally such claims are not properly presented for consideration on direct appeal. Under repealed Rule 27.26 exceptions were sometimes made where the facts were sufficiently developed upon the record to permit meaningful review. *See State v. Shipman,* 737 S.W.2d 267, 269 (Mo.App.1987). Particularly, where the claim of ineffective assistance is predicated upon an isolated trial incident fully reported on the record, it may be ripe for consideration on direct appeal. *State v. Phillips,* 460 S.W.2d 567, 569 (Mo.1970); *State v. Johnson,* 714 S.W.2d 752, 761 (Mo.App. 1986). The claim of ineffective assistance in this case falls within this limited exception and we address the merits of the claim.[1]

 Appellant contends he was denied his Sixth Amendment right to effective assistance of counsel because his trial counsel proceeded with a bench trial before a judge who had expressed on the record a reservation about the defense of mental disease or defect. The record reflects the case was set for a jury trial to commence on February 29, 1988. Prior to the calling of a jury panel the court was advised the defense desired to waive a jury trial. Appellant was sworn and interrogated extensively on the record by his trial counsel and by the court concerning his understanding of his right to trial by jury and the effect of a waiver of that right. Appellant acknowledged that he and his attorneys had discussed the pros and cons of a jury trial and he said it was his desire to waive a jury. At this point the court interrupted counsel's interrogation and the following colloquy took place.

THE COURT: Mr. Madison, I want to put something on the record.

Did I tell you this morning that it might be best for you not to waive a jury, because I did not feel inclined at the outset to go for not guilty by reason of mental disease or defect; in other words, that I had some reservations about it?

MR. MADISON: Yes, sir, you did.

---

1. We are not unmindful of the opinion in *State v. Wheat,* No. 40239 (W.D.September 6, 1988), 1988 WL 166523, wherein our colleagues ruled that the procedural changes enacted in Rule 29.15 precluded any consideration of claim of ineffective assistance unless asserted pursuant to the procedures of that rule. *Wheat* was transferred to the Supreme Court by Order of December 13, 1988 and remains pending at this time. Since we have concluded appellant's claim is without merit, even if the Supreme Court interprets Rule 29.15 as precluding consideration of an ineffective assistance claim on direct appeal regardless of the sufficiency of the record, the result in this case would be no different.

THE COURT: I just want it to hang right out on the record.

MR. MADISON: Yes.

THE COURT: And your comment when you walked in was that you had discussed that thoroughly; and there was difficulty with the jury on that defense, too. And we had a lot of discussions about it.

MR. MADISON: Yes.

THE COURT: Just so it is all out: Mr. Harris have you discussed that with your attorneys?

THE DEFENDANT: Yes, I have.

THE COURT: I am sorry to interrupt. You may proceed.

\* \* \* \* \* \*

Thereafter, appellant's trial counsel resumed his questions.

Q. (By Mr. Madison) Chris, in our discussions about whether to have a jury or whether to not have a jury, did Mr. Goulet and I point out to you that this was a complex defense?

A. Yes.

Q. All right. And did we also point out to you that there were certain things that might be to your advantage in having a jury, but there were also certain things that would be drawbacks to having a jury?

A. Yes.

Q. All right. Do you feel that we had a thorough discussion of the advantages and disadvantages of having a jury?

A. Yes.

Q. And it is still your decision to give up having a jury at your trial?

A. Yes, it is.

Q. All right. Has anybody threatened you, or promised you or coerced you to make that decision?

A. No.

Q. All right.

Several matters referred to in these discussions are deserving of particular attention. The reference to the earlier off-the-record discussions demonstrates that the decision to waive the jury was not made precipitously or without a thorough balancing of the perceived advantages and disadvantages involved.

We also note that the judge's statement referring to his inclinations and reservations does not indicate any refusal to consider the evidence relating to the defense of mental disease or defect or any conclusive pre-judgment of that issue. The trial judge is well known to us as an experienced and conscientious jurist. We are confident that he would not have given his assent, as required by Rule 27.01(b), to proceeding without a jury if he had predetermined the issue.

Most important is the clear and unequivocal expression repeatedly asserted by appellant that it was his desire, after thorough discussion with his attorney, that the case be tried without a jury. Appellant is in no position to claim his attorney was ineffective merely because he carried out his wishes. As stated *Peeler v. State*, 750 S.W.2d 687, 691 (Mo.App.1988), "[h]e was informed, according to his own testimony, ..., took a gamble and lost."

Claims of ineffective assistance of counsel are frequently asserted by successor counsel who "second-guess" original trial counsel's decisions of trial strategy after an adverse result. In this case trial counsel was armed with evidence from two qualified expert witnesses plus a history of bizarre behavior by appellant through which counsel reasonably could have expected to establish a mental disease defense. It is commonly accepted, especially by experienced criminal trial lawyers, that the defense of mental disease or defect is viewed with disfavor by the public and that jurors are reluctant to return a not guilty verdict lest it appear they have let a defendant "get away with" heinous misconduct. Such a defense is more palatable to trial judges, trained and experienced in requiring the State to prove a defendant's culpable mental state. In recommending that appellant waive a trial by jury, counsel was exercising reasonable discretion in a matter of trial strategy which does not form a basis for a charge of ineffective assistance. *Stubenrouch v. State*, 752 S.W.2d 327, 328 (Mo.App.1988). Moreover, only by resort

to sheer speculation can it be said the outcome of the trial would have been different if the case had been tried by a jury or by another judge. Appellant has not sustained his burden of showing a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Powers v. State,* 673 S.W.2d 506, 507 (Mo.App.1984).

The judgment is affirmed.

PUDLOWSKI, C.J., and CRANDALL, J., concur.